SUNDSTRAND CORPORATION AND CONSOLIDATED SUBSIDIARIES, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 27220-89, 1875-91.[1]        Filed May 4, 1992.

[1]These cases have been consolidated for purposes of trial, briefing, and opinion.

*John C. Klotsche, Bertrand M. Harding, Jr., Robert H. Albaral, James M. O'Brien, Mark A. Oates,* and *Neil D. Traubenberg,* for petitioners.

*Reid M. Huey, Joseph P. Grant,* and *Sherri L. Feuer,* for respondent.

OPINION

HAMBLEN, *Judge:* Respondent determined the following deficiencies in petitioners' income taxes for 1979, 1980, 1981, and 1982 (hereinafter sometimes referred to collectively as the years in suit):

| Year | Amount of deficiency |
| --- | --- |
| 1979 | $13,674,981 |
| 1980 | 28,541,936 |
| 1981 | 27,099,275 |
| 1982 | 18,461,344 |

Respondent also determined that petitioners are liable for increased interest under section 6621(c), formerly section 6621(d), on the basis that the deficiencies attributable to the section 482 issue also at issue in these cases constituted substantial underpayments attributable to tax-motivated transactions. However, these issues are not before us at this time.

All section references are to the Internal Revenue Code in effect for the taxable years in issue, unless otherwise noted. All Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

This matter is before the Court on respondent's motions for partial summary judgment filed pursuant to Rule 121. The issue which respondent seeks to have adjudicated is whether, as a matter of law, section 1481 does not apply to certain payments petitioners made to the Government in years after the years in suit.

Summary judgment is appropriate if the pleadings and other materials show that there is no genuine issue as to any material fact and a decision may be rendered as a matter of law. Rule 121(b); *Naftel v. Commissioner,* 85 T.C. 527, 529 (1985). A partial summary adjudication may be made which does not dispose of all the issues in the case. Rule 121(b). The nonmoving party cannot rest upon the allegations or denials in his pleadings, but must "set forth specific facts showing that there is a genuine issue for trial." *Dahlstrom v. Commissioner,* 85 T.C. 812, 820-821 (1985); Rule 121(d). The moving party, however, bears the burden of proving that no genuine issue exists as to any material fact and that he is entitled to judgment on the substantive issues as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Espinoza v. Commissioner,* 78 T.C. 412, 416 (1982). In deciding whether to grant summary judgment, we view the factual materials and inferences drawn from them in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Naftel v. Commissioner, supra* at 529. If there exists any reasonable doubt as to the facts at issue, the motion must be denied. *Espinoza v. Commissioner, supra* at 416.

We assume the facts described below on the basis of the pleadings and other pertinent materials in the record. Rule 121(b). They are stated solely for purposes of deciding the motion for partial summary judgment, however, and are not findings of fact for these cases. Fed. R. Civ. P. 52(a).

### Background

In the petitions filed with the Court petitioners allege that overpayments are due them pursuant to claims for refund they filed for the years in suit in the following amounts:

| Year | Overpayment claimed |
| --- | --- |
| 1979 | $114,540 |
| 1980 | 9,506,909 |
| 1981 | 17,043,706 |
| 1982 | 1,288,025 |

The overpayments arose as a result of certain payments Sundstrand Corp. (hereinafter petitioner) and its subsidiary Sundstrand Data Control, Inc. (SDC), agreed to pay to the Government as a result of the transactions described below. Petitioners claim the payments were made pursuant to the renegotiation of Government contracts within the meaning of sections 1481 and 1482,[2] and, therefore, the payments are entitled to the tax treatment set forth in those sections.

The nature and amount of the payments for which section 1481 treatment is claimed are as follows:

| Nature of payment | Years in dispute | Payment (in millions) | Total amounts claimed[1] under sec. 1481 (in millions) |
|---|---|---|---|
| Rockford civil settlement | 1981-1988 | $115.0 | $100.0 |
| Rockford admin. settlement | 1981-1988 | 71.6 | 71.6 |
| Seattle civ. plea & settlement | 1978-1989 | 12.3 | 11.3 |
| Seattle admin. settlement | 1978-1986 | 1.9 | 1.9 |
| Misc. aviation payments | 1985-1986 | 0.3 | 0.3 |
| Totals | | 201.1 | 185.1 |

[1]The differences between the amounts paid and the amounts for which petitioners claim treatment under sec. 1481 arise from certain fines and penalties that, for purposes of the claims for refunds, petitioners consider nondeductible.

The obligation for these payments arose from the transactions described below.

Petitioner and some of its subsidiaries, including SDC, have for many years served as contractors with the Department of Defense (DOD), as well as other Government agencies. As a

---

[2]Before its repeal by the Omnibus Budget Reconciliation Act of 1990, Pub. L. 101-508, sec. 11801(a)(37), 104 Stat. 1388, 1388-521, effective Nov. 5, 1990, sec. 1482 applied to payments which a subcontractor made to the prime contractor pursuant to a price redetermination provision in a subcontract subject to renegotiation under the applicable Federal renegotiation act. Although petitioners claim in the petitions that they are entitled to relief under secs. 1481 and 1482, all of the payments in issue in respondent's motion for partial summary judgment are payments petitioner made to the Government. Any relief for these payments would be covered under sec. 1481. Consequently, we have limited our discussion in this opinion to sec. 1481.

Government contractor, petitioner enters into contracts for supplies and services with the Government. Petitioner enters into certain of these contracts directly with the DOD as a prime contractor (prime contracts) and indirectly as a subcontractor to various prime contractors and higher tier subcontractors (subcontracts).

The Government's process of procuring supplies and services begins by either the DOD or the prime contractor sending solicitations to petitioner. Petitioner responds with a contract pricing proposal informing the DOD or the prime contractor of petitioner's price for performing the contract. The price submitted by petitioner includes its direct costs, indirect costs, and profit. The indirect costs (which include several overhead rates) are reflected as a percentage of the applicable direct cost.

Following negotiations between petitioner and representatives of the DOD or prime contractors, petitioner enters into various prime and subcontracts based primarily on negotiated firm fixed prices. Under these firm fixed-price contracts, petitioner is required to perform the contract for a set price regardless of the total costs petitioner incurs in the performance of the contract. Petitioner then generally is entitled to periodic reimbursement (progress payments) for a portion of the allowable direct costs, such as material and labor, and the allowable indirect costs, such as overhead, incurred by petitioner during the performance of the contract. On petitioner's request for progress payments (billings), indirect costs are calculated by applying established overhead percentages (billings rates) to other applicable costs. Overhead billings rates used for progress payment billings are established by a forward pricing rate agreement (FPRA) between petitioner and DOD for years when a FPRA is in effect and by calculations based on petitioner's actual overhead when a FPRA is not in effect.

As a defense contractor, petitioner is bound by and subject to a number of regulatory requirements including: The Defense Acquisition Regulations (DAR) (before April 1, 1984), the Federal Acquisition Regulations (FAR) (after April 1, 1984), the Department of Defense Supplement to the Federal Acquisition Regulations (DSFAR), the Cost Accounting Standards (CAS), and the Truth-in-Negotiations Act (TINA) (herein-

after sometimes collectively referred to as the Government contracting regulations). These Government contracting regulations obligate petitioner in most cases to: (1) Disclose to the DOD (or prime contractor) all cost and pricing data that would significantly affect price negotiations; (2) execute, before the contract award, a Certificate of Current Cost or Pricing Data, certifying that the cost or pricing data submitted in the contract pricing proposal was current, accurate, and complete; and (3) strictly adhere to CAS promulgated by the Cost Accounting Standards Board. In addition, these provisions collectively make certain contractor-incurred costs unallowable (i.e., not recoverable from the Government) and require the contractor to segregate these costs and not include them in contracts to which the Government is a party. From at least January 1, 1982, the applicable Government contracting regulations require petitioner to allocate allowable indirect costs to petitioner's overhead billing rates in proportion to the benefits derived from those costs.

These Government contracting regulations, as well as specific provisions contained in most of petitioner's contracts with the DOD, authorize the Defense Contract Audit Agency (DCAA) to audit petitioner's practices for compliance with DAR, DSFAR, CAS, and TINA. A standard contract clause inserted in most of petitioner's Government contracts: (1) Mandates that petitioner comply with all CAS in effect when the contract was awarded, (2) requires petitioner to negotiate equitable adjustments if petitioner was found to be in noncompliance, and (3) requires petitioner to negotiate with the Administrative Contracting Office (ACO) to determine the terms and conditions under which a change is to be made prospectively to a cost accounting practice.

For the years in suit the Government contracting regulations prohibited petitioner from including an excess of costs over income on any contract (cost overrun) in its overhead billing rates. They also required petitioner to estimate, accumulate, and report contract costs in a consistent manner and to charge contract costs incurred for the same purpose in a consistent manner. The Government contracting regulations also required petitioner to submit to the DOD a disclosure statement accurately describing petitioner's cost accounting practices and

to amend that disclosure statement when necessary to accurately describe petitioner's cost accounting practices.

The DCAA is responsible for the audit function associated with Government contracts. In auditing defense contractors, the DCAA follows generally the guidelines set forth in the Defense Contract Audit Manual which establishes three principal types of audits: (1) An operations audit, which involves a review of a contractor's "systems", such as accounting systems, pricing systems, and purchasing systems; (2) a post-award audit, which involves a review of particular contracts for defective pricing issues and TINA-related issues; and (3) an incurred costs audit, which involves a review of actual costs incurred by the contractor in previous years to verify that the then current accounting practices are in compliance with CAS.

With the exception of post-award audits, which are conducted on a contract-by-contract basis, the DCAA conducts these audits by reference to a particular time frame, typically a year. With respect to the Rockford-related settlement payments in issue, the only type of audit conducted by the DCAA that has relevance to the payments for which section 1481 treatment is claimed was an incurred costs audit. The Seattle-related payments in issue involved both incurred costs and post-award audits.

Upon completion of an incurred costs audit, the DCAA issues a determination of adequacy if the contractor's practices are in compliance; if not, an initial determination of noncompliance may first be issued by the ACO, followed next by a final determination of noncompliance. Assuming no agreement at this stage, a final decision is issued by the ACO. From there, the contractor can appeal the ACO decision either to the U.S. Claims Court or the Armed Services Board of Contract Appeals (ASBCA).

In the early eighties, the DCAA began comprehensive audits of petitioner and its subsidiaries, including SDC, relating to petitioner's Government contracting practices. During the course of these audits, the DCAA examined no less than 36 CAS issues involving petitioner and 10 CAS and 16 potential defective pricing issues involving SDC. These audits resulted in the issuance of a multitude of DCAA preliminary and final determinations and ACO final decisions, some of which were

appealed by petitioner or SDC to the ASBCA. Issues disclosed in connection with several of the CAS-related audits ultimately were the subject of the Rockford and Seattle plea agreements.

## A. *The Rockford Transactions*

In December 1983, the DCAA commenced an audit of CAS issues related to petitioner's transactions with SAJAC Co. Inc. (SAJAC), which audit ended in the issuance of two separate audit reports dated June 14, 1985, and August 28, 1985. In both instances, the ACO made determinations that petitioner was not in compliance with CAS relating to its treatment of Inventory, Loss, Obsolescence, and Shortage Costs (ILOS), to which determinations petitioner took exception. Negotiations regarding these accounting practices were suspended in 1986 when the Federal grand jury in Rockford, Illinois (Rockford grand jury), began its investigation.

In September 1984, the DCAA issued an audit report which alleged that petitioner was in noncompliance with CAS with respect to its applied production costs (APC) and manufacturing overhead accounts. Petitioner took exception to the DCAA findings and over the next 2 years, petitioner and the DCAA attempted to negotiate a settlement of these issues, as well as other alleged CAS violations. In 1986, before any resolution was reached, negotiations were suspended when issues involving petitioner's conduct in connection with the APC matter were referred to the Rockford grand jury for further investigation.

On September 21, 1988, as a result of the pending Rockford grand jury investigation, the Government issued a bill of information charging petitioner with three counts of criminal violations under 18 U.S.C. sec. 371 (conspiracy to commit offense or to defraud United States) and one count of a criminal violation under 18 U.S.C. sec. 287 (false, fictitious, or fraudulent claims).

The first count charged petitioner with conspiracy to defraud the United States and the DOD of money and design rights, from at least August 12, 1981, to at least June 3, 1985, by concealing cost overruns on design and development contracts, as well as other concealed mischarged development costs, in petitioner's overhead billing rates applied to DOD contracts in order to receive the contracts (and payments under the

contracts, including its cost overruns) and retain the design rights to the hardware developed under those contracts. The alleged illegal activities which were the subject of the first count had as their origin the cost accounting practices which had been the subject of a DCAA audit.

The second count charged petitioner with a conspiracy to defraud the United States and the DOD and commit a criminal offense against the United States, from at least February 1980 to at least November 9, 1986, by providing gratuities to DOD personnel and their spouses to improve petitioner's ability to market hardware to the DOD while at the same time concealing the identity of the personnel. The Rockford grand jury investigation relating to the payment of these gratuities disclosed a separate CAS violation involving the allocation of unallowable costs to Government contracts which had not been identified previously by the DCAA.

The third count charged petitioner with a conspiracy to defraud the Internal Revenue Service, from at least April 7, 1983, to and including at least December 4, 1984, by obstructing its lawful function in the ascertainment, computation, assessment, and collection of Federal taxes. The alleged object of the conspiracy was to ensure petitioner's ability to take inventory write-downs or losses on the shipment of parts to SAJAC by concealing the true nature and extent of the control exercised by petitioner after shipment of the parts to SAJAC.

The last count charged petitioner, from at least January 1, 1980, to on or about January 1, 1987, with knowingly filing false, fictitious, and fraudulent claims against the DOD and the United States in the form of progress payment billings that contained unallowable and misallocated indirect costs concealed in the general and administrative (G&A) overhead billing rates. Unallowable and misallocated indirect cost items included, among other things, liquor, babysitting, gifts, travel by executives' spouses, cigarettes, candy, saunas, golf, tennis, country club dues, movies, jewelry, clothes, airline club memberships, dog kennels, snowplowing at executives' homes, radar detectors, air shows, advertising, entertainment, lobbying costs, acquisition costs, nonbusiness travel, excess compensation, and servants for executives and their spouses. The Rockford grand jury investigation relating to these claims identified a separate civil CAS violation involving the allocation

of unallowable costs to Government contracts previously identified by the DCAA.

On October 21, 1988, petitioner pled guilty to all four counts. The maximum potential total penalty for these charges was 5 years of probation, a fine equal to twice the gross gain or loss arising from the offenses, and restitution in the amount of the loss arising from the offenses. Pursuant to a plea agreement entered into between petitioner and the United States (the Rockford plea agreement), the parties agreed that a 3-year period of probation was appropriate with certain special conditions, including the following:

8. In full payment of restitution, damages, penalties, fines, and costs in connection with this plea agreement and the settlement agreement attached hereto as Exhibit B Sundstrand shall pay to the United States the sum of $115,000,000. Not later than 5 days following entry of judgment of conviction, Sundstrand will:

(a) wire transfer to the United States, in accordance with its directions, the sum of $82,000,000 plus interest at the rate specified in 28 U.S.C. § 1961 from the date this plea agreement is executed; and

(b) provide the United States with a promissory note in the amount of $33,000,000 payable in installments of $11,000,000 each to be wire transferred to the United States, in accordance with its directions, on or before the anniversary date of this plea agreement for the next three years.

In addition, in accordance with 18 U.S.C. sec. 3013 (1988),[3] petitioner was ordered to pay a mandatory special assessment of $100 for each count to which it pled guilty.

The Rockford plea agreement further provides that the United States would not pursue any additional criminal charges against petitioner directly related to or arising from

---

[3]The pertinent portions of 18 U.S.C. sec. 3013 (1988), in effect at the time of sentencing, provided as follows:

Sec. 3013. Special assessment on convicted persons
(a) The court shall assess on any person convicted of an offense against the United States—
(1) in the case of a misdemeanor—
(A) the amount of $25 if the defendant is an individual; and
(B) the amount of $100 if the defendant is a person other than an individual; and
(2) in the case of a felony—
(A) the amount of $50 if the defendant is an individual; and
(B) the amount of $200 if the defendant is a person other than an individual.
(b) Such amount so assessed shall be collected in the manner that fines are collected in criminal cases.

This assessment is not a fine as petitioners contend. Rather, the main purpose of 18 U.S.C. sec. 3013 is to raise funds to support victims' assistance and compensation programs. *United States v. Munoz-Flores,* 495 U.S. 385 (1990).

the following matters to the extent they occurred before June 1, 1988:

(a) the charging of engineering costs to APC and MOH [manufacturing overhead] accounts and the inclusion of such costs in research and development tax credit calculations;

(b) the provision of gifts and entertainment to government employees only to the extent such gifts and entertainment are recorded on expense reports;

(c) the charging to ILOS accounts of write-offs for inventory shipped to SAJAC, the inclusion of such write-offs in cost-of-sales tax calculations, and the pricing of and charges to government programs for inventory reacquired from SAJAC;

(d) the inclusion in G&A accounts of costs identified in Sundstrand's 1985 "scrubbing" exercise and of misallocated Sundstrand Service Corporation costs which should properly have been allocated to [SDC]; and

(e) the charging to space shuttle contracts of mechanical product line engineering costs, including engineering labor, unrelated to space shuttle programs, which improper practice is hereby admitted by Sundstrand.

In the Rockford plea agreement, petitioner admitted, among other things, that as a result of its illegal conduct, as alleged in counts one and four, it had obtained millions of dollars in DOD payments to which it was not entitled.

In accordance with the Rockford plea agreement, effective August 29, 1988, petitioner entered into a civil settlement agreement with the United States (the Rockford civil settlement agreement), pursuant to which petitioner agreed to pay to the Government a total of $115 million. As early as April 11, 1988, the Government had claimed that petitioner had overcharged the Government $312,400,000 referable to certain alleged accounting practice noncompliances described in the Rockford civil settlement agreement.

The Rockford civil settlement agreement recited, among other things, the following:

3. Beginning at least as early as January 1, 1980, and continuing to July 1, 1987, Sundstrand improperly accounted for a portion of its costs: (1) by posting to its Applied Production Costs (APC) and Manufacturing Overhead accounts, which were indirect overhead accounts partially reimbursed by the United States, engineering costs, including cost overruns, that were directly related to specific contracts; (2) by posting to its General and Administrative (G&A) account expenses that were not allowable in accordance with applicable Government accounting regulations and standards then in effect; (3) by posting to its Inventory Loss, Obsolete and Scrap (ILOS) account certain inventory loss costs connected with Sundstrand's sale of purportedly obsolete inventory to SAJAC Corporation; (4) by failing to disclose Sund-

strand's true cost of such inventory, *i.e.*, the cost of re-acquiring it from SAJAC, when negotiating contract prices involving the Government's purchase of such inventory or products that incorporated such inventory; and (5) by misallocating to Sundstrand's Advance Technology Group aviation division a disproportionate share of the costs of Sundstrand Service Corporation, a wholly owned subsidiary of Sundstrand.

4. Sundstrand, in a separate Plea Agreement executed contemporaneously herewith, has agreed with the United States to plead guilty to an information charging several criminal violations as set forth with more specificity in the Plea Agreement.

5. The United States claims that it is entitled to statutory and common law relief, including civil penalties and multiple damages under the False Claims Act, 31 U.S.C. §§ 3729-3731, because of Sundstrand's conduct.

6. Sundstrand disputes the extent of such claims.

7. Sundstrand and the United States mutually wish to resolve this dispute without litigation and desire to make a full, complete, and final settlement and compromise of the claims of the United States.

ACCORDINGLY, in consideration of the mutual promises and obligations of this Settlement Agreement, the parties agree and covenant as follows:

### III. *Terms of Agreement*

8. Conditioned upon the acceptance of the guilty pleas by the United States District Court for the Northern District of Illinois as contemplated in the Plea Agreement executed by the parties contemporaneously herewith, Sundstrand shall pay to the United States One Hundred Fifteen Million Dollars ($115,000,000), * * * .

*     *     *     *     *     *     *

11. Conditioned only upon receipt of the payment specified above * * *, the United States hereby releases and agrees to refrain forever from instituting, prosecuting, or maintaining:

(a) any civil or administrative action against Sundstrand for any and all claims, damages, and causes of action that the United States has or may have under common or statutory law, including but not limited to the Contract Disputes Act and the False Claims Act, 31 U.S.C. §§ 3729-3732, with respect to the matters charged in the information to be filed pursuant to the Plea Agreement, * * *;

(b) any civil action pursuant to the False Claims Act, * * *, or based upon common law fraud with respect to: (1) the charging to space shuttle contracts of mechanical product line engineering cost, including engineering labor, unrelated to space shuttle programs; and (2) to matters raised in the audit reports of the Defense Contract Audit Agency (DCAA) listed in the Schedule of DCAA Audits attached hereto as Exhibit II; *Provided,* that the release contained in this paragraph 11(b) shall not release, settle, or affect any causes of action or contractual claims that the United States has or may have under common law, other than common law fraud, or the Contracts Disputes Act based on mischarging of engineering costs to space shuttle contracts or matters raised in the DCAA audit reports listed in the Schedule of DCAA audits attached hereto as Exhibit II; *Provided further,* that the

release contained in this Settlement Agreement shall not release, settle, or affect any claims that the United States has or may have involving design or data rights for products other than those claims that are based upon Sundstrand's charges to APC and Manufacturing Overhead during the time period between January 1, 1980, and July 1, 1987; *Provided further,* that the release contained in this Settlement Agreement shall not release, settle, or affect any claims that the United States has or may have involving any express or implied product liability warranty or for latent defects under the inspection clause of any Government contract or subcontract; *Provided further,* that the release contained in this Settlement Agreement shall not release, settle, or affect any claims that the United States has or may have against entities or persons other than Sundstrand Corporation; *Provided further,* that the release contained in this Settlement Agreement shall not release, settle, or affect any claims that the United States has or may have arising under the Internal Revenue Code, Title 26, United States Code; and *Provided further,* that the release contained in this Settlement Agreement shall not release, settle, or affect any suspension or debarment action.

Exhibit II of the Rockford civil settlement agreement lists "Other CAS Issues" and the dates the audit reports were issued as follows: Misallocation of FMS and Foreign Sales of Military Product Marketing—Selling Costs to Government Contracts (1/22/86); Misallocation of Commercial Warranty Costs to Government Contracts (12/3/84); Misallocation of Commercial Field Service Costs and Overcharging of Contract Administration Costs to Government Spare Parts Contracts (1/6/86); Misallocation of Commercial Overhaul/Repair Cost to Government Contracts (2/5/86); Mispricing of Singapore Costs on Government Pricing Proposals/Contracts Due to Improper Singapore Exchange Rate Being Used (1/14/86); Charging of Free Issue Parts In Overhead, Both Direct and Indirect to Government Contracts (5/7/86); Misallocation (Overcharging) of Self Insurance (Contractor-owned) Costs to Government Contracts (11/27/87); Misallocation of Supplemental Pension Costs to Government Contracts (11/27/87); Misallocation of Commercial Product Liability Cost to Government Contracts (11/27/87); Misallocation of Commercial EDP Costs to Government Contracts (12/17/85); Misallocation of Air Show Cost to Government Contracts (5/7/86); Misallocation of Commercial Excess Inventory Cost to Government Contracts (9/28/84); and Misallocation of Aviation and Fluid G&A Expenses[4] (8/26/86).

---

[4]The balance of the copy of this page on Ex. II furnished to the Court is illegible.

Totally separate from the numerous cost accounting matters that were the subject of the Rockford civil settlement agreement, the DCAA had commenced audits relating to a number of other pricing and cost accounting issues on petitioner's Government contracts which had been concluded and/or performed between 1981 and 1988. Although these CAS disputes were not a part of the Rockford grand jury investigation, their pendency was suspended during that investigation.

Following the entry of the Rockford plea agreement, these issues were returned to the ACO for administrative resolution. On January 19, 1989, the parties executed a settlement agreement (the Rockford administrative settlement agreement) resolving many of these alleged CAS noncompliances wherein petitioner agreed to: (1) Pay the DOD $62.3 million for alleged CAS noncompliances plus $1.9 million in unallowable costs and (2) absorb and not charge to any Government contract so-called "controverted costs", which represented. the recovery of disputed costs over 6 months of 1987 and 12 months of 1988, determined later to be $7.1 million.[5] The Rockford administrative settlement agreement became effective upon the lifting of the suspension barring petitioner from doing business with the Government. The settlement specifically excluded defective pricing of direct costs and technical data rights determinations.

In early 1989, the Defense Logistics Agency, an office within the DOD, prepared a price/cost analysis report (the analysis) to review and evaluate the excess costs that petitioner charged on sales to prime or higher tier contractors during 1981 through 1988 as a result of its fraudulent practices and inflated overhead rates resulting from noncompliance with several CAS. The analysis, among other things, sets forth a computed dollar value of the overcharging by petitioner. (The Seattle civil and administrative settlement agreements were not included in the analysis.) It appears that the DOD undertook the analysis to

---

[5]Petitioners claim relief under sec. 1481 for payments of $71.6 million pursuant to the Rockford administrative settlement agreement. The $62.3 million plus $1.9 in "other unallowable costs" equals a total of $64.2 million. (There is no explanation in the filings as to the nature of the $1.9 million of other unallowable costs.) The $64.2 million plus $7.1 million in controverted costs gives a total of $71.3 million. According to petitioner, the difference between the $71.6 million claimed and the $71.3 million calculated above is due to rounding errors contained in the price/cost analysis report prepared by an office of the DOD.

recover for the Government from the prime and/or higher tier contractors the excess dollars of passthrough costs and profit that the prime and higher tier contractors realized as a result of petitioner's overcharging.

Pertinent portions of the analysis provide as follows:

3. *Price/Cost Analyst's narrative statement and explanatory rationale.*
    a. *General Statement:*

The following is a general statement of data sources, positions taken and assumptions made in the preparation of this case.

(1) The possibility of computing the impact of prime contractor overcharging, on a contract by contract basis, was considered and was rejected; for two reasons. First, it was considered highly problematic that the bottom line results of such an approach would yield significantly different findings than the more general approach, taken in this case and second, when consideration was taken of the amount of time and resources that would have to be dedicated to such an effort, in light of the low probability for potential gain, the contract by contract approach was considered as a counterproductive resource utilization.

(2) The sales figures and other data presented in this case are based on CAS covered contracts only. The Price/Cost Analyst does not have a specific dollar break out of sales dollars of CAS covered versus NON-CAS covered contracts. The percentage relationship is known. CAS covered contracts account for 95.5% of all ATG [Advanced Technology Group] Government contracts. For the purposes of this analysis however, it was considered that NON-CAS covered contracts to prime contractors would be nil or almost nil and that the great preponderance of the NON-CAS covered contracts i.e. contracts under $100,000, were spare part contracts, to the services.

(3) The Price/Cost Analyst assumed that of the 100 million dollar[6] Grand Jury recovery 100 million related to overcharging and 15 million constituted a fine. * * *

    b. *Elements of overstated costs:*

The overstated costs break down into three basic elements, as follows:

(1) *Grand Jury Issues:* The Federal Grand Jury, that was convened at Rockford Illinois for almost two years, looked at a very wide range of issues relative to Sundstrand Corporation and its operations. In certain areas of overhead rates, for example the Applied Production Cost rate, fraudulent activities were uncovered. Thus, when Sundstrand pled guilty in Federal Court to four different counts and paid 115 million dollars, that payment constituted a total recovery of all of the areas involved with criminal activities, including Applied Production Cost. However, because of the nature of that recovery i.e. a total dollar amount recovered by the Department of Justice, there was no breakdown or delineation of how many dollars related to any one area or element. Thus, when it came to the calculations

---

[6] The total amount should be $115 million.

in enclosure 1, certain assumptions had to be made. Therefore, the Price/Cost Analyst assumed, for the purposes of this case, that 100 million dollars of the recovery related to actual fraudulent overcharging and that 15 million dollars constituted a "fine" and penality [sic] calculation. However, because the actual ratio of overcharging dollars versus fine dollars can never be proven exactly, this area remains open to discussion.

(2) *Non-Grand Jury Issues:* In some of the areas, reviewed by the Justice Department, there were no fraudulent activities and those issues were remanded back to this DCASPRO [Defense Contract Administration Services Plant Representative Office] for the resolution of prior CAS non-compliance problems. As a result, intensive negotiations were entered into which resulted in the signing of the [the Rockford administrative] Settlement Agreement, * * * and the payment of the additional 62.3 million dollars. * * *.

(3) *Controverted Costs:* During the negotiations of the Forward Pricing Rate Agreement, FPRA, in February 1987: a dispute arose relating to Cost Accounting Standards (CAS) noncompliances. Sundstrand agreed to remove certain disputed costs from the G&A and Business Support expenses. * * * [I]n the [Rockford administrative] Settlement Agreement Sundstrand agreed to forgo these controverted costs and the Government won this issue and retained/recovered all controverted cost dollars. * * *

c. *Overcharging calculations* * * *.

The *general position* statements, on which the overcharging calculation was based are as follows:

The $64,200,000* settlement of Non-Grand Jury issues represents 66.05% of the original $97,205.00 [sic] computed cost impact for those issues.

The $7,100,000 controverted costs represent recovery of disputed cost over a period of eighteen months, 6 months of 1987 and 12 months of 1988.

The $100,000,000 Grand Jury issue amount was divided over the years 1981 through 1988 with a $12,500,000 impact for each year.

*See the grand total, for the non-grand jury issues, * * *. This total includes approximately 1.9 million in other unallowable costs.

The *calculation methodology* * * * is as follows:

The Non-Grand Jury cost impact was factored * * * and was then added down by year and across by issue to yield the sub-total for those issues. To that sub-total controverted costs were added, for the years 1987 and 1988. Next, the $100,000,000 Grand Jury recovery was amortized over eight years at $12,500,000 per year * * *. The 12,500,000 was then added to the prior sub-total of Non-Grand Jury and Controverted Cost amounts to yield total calculated dollar recovery. The recovery amount was then divided by total Sundstrand ATG sales to the Government, for the appropriate years, to calculate the percentage of overcharging. That percentage was then taken times the total sales, to each Contractor, to yield the dollars of overcharging by year with the years 1981 through 1988 added to arrive at the total amount of overcharging.

B. *The Seattle Transactions*

The DCAA commenced several audits of SDC in late 1981, one of which resulted in a determination that SDC was not in compliance with CAS with respect to the allocation of certain unallowable costs to Government contracts. Negotiations regarding SDC's accounting practices continued during an investigation of SDC by the Seattle grand jury. Matters under investigation, among other things, included CAS compliance issues.

On May 4, 1988, to resolve the criminal investigation of SDC being conducted by the Fraud Section, Department of Justice, and other Government contract and accounting disputes between the Government and SDC, SDC entered into a plea agreement with the Government (the Seattle plea agreement). In the Seattle plea agreement SDC agreed to waive indictment and pled guilty to charges in a proposed information (subsequently filed on October 12, 1988).

Under the Seattle plea agreement, SDC agreed to a criminal fine of $500,000, the maximum potential penalty for the offense. SDC also agreed to pay to the Government $11,300,000, plus interest from February 8, 1988, in full administrative satisfaction of all contractual claims by the Government arising out of the contracts and issues addressed in an agreement entered into shortly before the Government, SDC, and Boeing Co. of Seattle, Washington (Boeing), of which SDC was a subcontractor (the Seattle civil settlement agreement). In addition, SDC agreed to pay to the Government $520,000 pursuant to a separate settlement agreement between SDC and the United States, for statutory and common law relief, including civil penalties and multiple damages under the False Claims Act, 31 U.S.C. secs. 3729-3733 (1988), relating to the misconduct charged in the information of $160,000[7] and reimbursement of the costs of the investigation of $360,000.

The Government agreed not to pursue any additional criminal charges against SDC with respect to civil CAS-related

---

[7]The total amount agreed to for statutory and common-law relief, including civil penalties and multiple damages under the False Claims Act, 31 U.S.C. secs. 3729-3733 (1988), was $12,591,533.25. SDC received credit for $11,461,508.25, consisting of the $11,300,000 SDC agreed to pay the United States plus accrued interest, and the $610,025 Boeing agreed to pay the United States pursuant to the Seattle civil settlement agreement.

issues which were the subject of the Seattle civil settlement agreement.

As part of its sentence, in addition to the $500,000 fine imposed, SDC was ordered to pay a mandatory special assessment of $200 in accordance with 18 U.S.C. sec. 3013 (1988).

The information relating to the Seattle plea agreement alleged that between August 1982 and December 1986 SDC submitted numerous forms and invoices claiming payment from the DOD or a prime contractor to the DOD which claims SDC knew were potentially false, fictitious, and fraudulent, being based on unit prices that were negotiated in part on a fraudulently inflated FPRA. The information also alleged that, in violation of 18 U.S.C. secs. 287 (1988) (false, fictitious, or fraudulent claims) and 2 (1988) (principals), on or about March 13, 1985, SDC knowingly presented or caused to be presented to the DOD a claim by a prime contractor which was based in part on a false, fictitious, and fraudulent SDC invoice based on a FPRA that included an unallowable cost. The information identified the unallowable cost as approximately $234,000 of unallowable patent litigation costs.

In the Seattle civil settlement agreement, SDC agreed to pay $11.3 million to the Government to settle all outstanding and pending disputes between SDC and the Government, including—

those matters under investigation by the [Seattle] grand jury, those matters on appeal before the Armed Services Board of Contract Appeals (hereinafter "ASBCA") and the various defective pricing claims and issues raised by the * * * ACO, DCAA and GAO [Government Accounting Office] determinations, audits and reviews.

The Seattle civil settlement agreement outlines specific CAS issues, defective pricing issues, fraud defense costs, and labor mischarging issues covered. In the agreement, the parties specifically allocated $2,780,841 from the total settlement amount to the defective pricing issues. They also specified that the fraud defense costs (Seattle grand jury costs) included in SDC pricing rates and actually incurred would be treated as unallowable costs. The Seattle civil settlement agreement acknowledges that discrete adjustments were not made in the administrative settlement to the various affected contracts.

Specifically excepted from the Seattle civil settlement agreement were any civil or criminal actions which could arise out of the ongoing Seattle grand jury investigation.

Additionally, in the Seattle civil settlement agreement, Boeing agreed to pay the United States $610,025 as a monetary settlement of all:

outstanding and pending disputes between them relating to SDC's accounting and pricing practices described * * * [in the agreement], including those matters, claims and issues identified * * * [above], stemming from Boeing's role as prime contractor on certain of the contracts affected by the above-mentioned [Seattle grand jury] investigation, determinations, audits or reviews.

Totally separate from the issues that were the subject of the Seattle civil settlement agreement, SDC had been under audit by the DOD for certain alleged CAS noncompliance issues relating to the allocation of costs to warranties and other various CAS claims. The warranty matter had been the subject of noncompliance determinations dating back to 1985 and had been appealed to the ASBCA. On June 10, 1987, in exchange for payment of $1,308,000, SDC was released from all claims arising out of the ACO's determinations of warranty noncompliance pursuant to the terms of a settlement agreement entered into with the Government (Seattle administrative settlement agreement I).

Other (nonwarranty) CAS-related disputes had their origins as early as 1982 and related to a variety of accounting matters including labor variances, freight, rework costs, and ILOS. By agreement dated February 5, 1988 (the Seattle administrative settlement agreement II), and in exchange for payment of $370,000,[8] plus interest, the matter was resolved and SDC was

---

[8]The affiant swearing to this matter alleges that the parties agreed to settle this issue for a payment of $620,000. The Seattle administrative settlement agreement II, however, states as follows:

I. The Government accepts SDC's offer of $370,000, plus the interest on $250,000 for the period from May 15, 1987 through December 8, 1987, plus interest on the total of those two amounts from December 8, 1987, as complete settlement of the disputed matters and the voluntary cost accounting practices discussed above and applicable to contracts with SDC or affected prime contractors.

II. SDC will designate * * * officials authorized to direct disbursement * * * to Agencies of the U.S. Government of the $370,000 plus interest * * *.

No further explanation is provided about this matter.

released from all administrative claims arising out of these alleged CAS practices.

## Discussion

With this background, respondent contends that petitioner's and SDC's payments to the Government pursuant to the Rockford plea and civil settlement agreements and the Seattle plea and civil settlement agreements (hereinafter sometimes collectively referred to as the grand jury settlement agreements) and the Rockford administrative settlement agreement[9] (hereinafter sometimes collectively referred to as the settlement agreements) did not result from a "renegotiation" of a Government contract as defined by section 1481(a) (hereinafter sometimes referred to as the Government claims issues). Thus, respondent argues, since petitioner's liability for the payments made under the settlement agreements arose after the years in suit and section 1481 does not apply to those payments, petitioners would be entitled to offset income by the amount of those repayments, if at all, in the year of repayment. (As a result, factual questions relating to the characterization of the payments among fines, penalties, interest, and restitution are not before the Court in respondent's motions for partial summary judgment.)

Under section 1481(a)(1),[10] a taxpayer who, pursuant to the

---

[9]In her memoranda in support of the motions for partial summary judgment, respondent identifies the payments in issue as $115 million paid under the civil settlement agreement, $65 million paid under the Rockford administrative settlement agreement, and $12.3 million paid under the Seattle civil settlement agreement. According to a schedule prepared by petitioners, however, they claim relief under sec. 1481 for $100 million paid under the Rockford civil settlement agreement, $71.6 million paid under the Rockford administrative settlement agreement, $11.3 million paid under the Seattle civil settlement agreement, $1.9 million paid under the Seattle administrative settlement agreement, and $.3 million paid as misc. aviation payments. We can account for only $71.3 million of the $71.6 million petitioners claim under the Rockford civil settlement agreement. See *supra* note 5. Respondent specifically excepts from her motions for partial summary judgment the $1.9 million and $.3 million payments on the basis that at the time she filed her motions for partial summary judgment she had not determined whether there were any material facts in dispute regarding these items. It appears that respondent has overlooked the $7.1 million in controverted costs which, in the Rockford administrative settlement agreement, petitioner agreed not to charge to any Government contract. Based on the text of her memoranda in support of her motions for partial summary judgment, however, we conclude that respondent does not concede that item falls within the provisions of sec. 1481.

[10]For the years in suit, sec. 1481(a) provided in pertinent part as follows:

CHAPTER 4—RULES APPLICABLE TO RECOVERY OF
EXCESSIVE PROFITS ON GOVERNMENT CONTRACTS

\*   \*   \*   \*   \*   \*   \*

renegotiation of a Government contract or subcontract, is required to pay or repay to the Government amounts determined to be excessive profits which were received or accrued by the taxpayer for a prior taxable year is not entitled to a deduction in the year of the repayment for the amounts repaid. Rather, the taxpayer must reduce his gross income for the prior taxable year by the amount of the repayment. For

---

Subchapter B—Mitigation of Effect of Renegotiation of Government Contracts

    \*     \*     \*     \*     \*     \*     \*

SEC. 1481. MITIGATION OF EFFECT OF RENEGOTIATION OF GOVERNMENT CONTRACTS.

(a) REDUCTION FOR PRIOR TAXABLE YEAR.—

(1) EXCESSIVE PROFITS ELIMINATED FOR PRIOR TAXABLE YEAR.—In the case of a contract with the United States or any agency thereof, or any subcontract thereunder, which is made by the taxpayer, if a renegotiation is made in respect of such contract or subcontract and an amount of excessive profits received or accrued under such contract or subcontract for a taxable year (referred to in this section as "prior taxable year") is eliminated and, the taxpayer is required to pay or repay to the United States or any agency thereof the amount of excessive profits eliminated or the amount of excessive profits eliminated is applied as an offset against other amounts due the taxpayer, the part of the contract or subcontract price which was received or was accrued for the prior taxable year shall be reduced by the amount of excessive profits eliminated. For purposes of this section—

(A) The term "renegotiation" includes any transaction which is a renegotiation within the meaning of the Renegotiation Act of 1951, as amended (U.S.C. App. 1211 and following), any modification of one or more contracts with the United States or any agency thereof, and any agreement with the United States or any agency thereof in respect of one or more such contracts or subcontracts thereunder.

(B) The term "excessive profits" includes any amount which constitutes excessive profits within the meaning assigned to such term by the Renegotiation Act of 1951, as amended, any part of the contract price of a contract with the United States or any agency thereof, any part of the subcontract price of a subcontract under such a contract, and any profits derived from one or more such contracts or subcontracts.

(C) The term "subcontract" includes any purchase order or agreement which is a subcontract within the meaning assigned to such term by the Renegotiation Act of 1951, as amended.

(2) REDUCTION OF REIMBURSEMENT FOR PRIOR TAXABLE YEAR.—In the case of a cost-plus-a-fixed-fee contract between the United States or any agency thereof and the taxpayer, if an item for which the taxpayer has been reimbursed is disallowed as an item of cost chargeable to such contract and the taxpayer is required to repay the United States or any agency thereof the amount disallowed or the amount disallowed is applied as an offset against other amounts due the taxpayer, the amount of the reimbursement of the taxpayer under the contract for the taxable year in which the reimbursement for such item was received or was accrued shall be reduced by the amount disallowed.

(3) DEDUCTION DISALLOWED.—The amount of the payment, repayment, or offset described in paragraph (1) or paragraph (2) shall not constitute a deduction for the year in which paid or incurred.

(4) EXCEPTION.—The foregoing provisions of this subsection shall not apply in respect of any contract if the taxpayer shows to the satisfaction of the Secretary that a different method of accounting for the amount of the payment, repayment, or disallowance clearly reflects income, and in such case the payment, repayment, or disallowance shall be accounted for with respect to the taxable year provided for under such method, which for the purposes of subsections (b) and (c) shall be considered a prior taxable year.

[Repealed by Omnibus Budget Reconciliation Act of 1990, Pub. L. 101-508, sec. 11801(a)(37), 104 Stat. 1388, 1388-521, effective Nov. 5, 1990.]

purposes of this section, renegotiation is defined to include any transaction which is a renegotiation within the meaning of the applicable Federal renegotiation act, any modification of one or more contracts with the United States or any of its agencies, and any agreement with the United States or any of its agencies relating to one or more such contracts or subcontracts under such contracts. Sec. 1481(a)(1)(A). Excessive profits are defined to include any amount which constitutes excessive profits as defined under the applicable Federal renegotiation act, any part of the contract price of a contract with the United States or any of its agencies, any part of the subcontract price of a subcontract under such contract, and any profits derived from one or more such contracts or subcontracts. Sec. 1481(a)-(1)(B).

According to respondent, the amounts petitioner and SDC repaid to the Government under the grand jury settlement agreements arose from illegal conduct they used to induce the Government to enter into the original contract arrangements. Furthermore, respondent contends the amounts petitioner repaid to the Government under the Rockford administrative settlement agreement also were the product of illicit conduct. Respondent asserts that price rollbacks were mandated when the Government discovered the illegal practices used by petitioner. Relying on *Fleet Carrier Corp. v. Commissioner,* 37 T.C. 527, 536 (1961), respondent argues that "there was no 'original valid contract price' which was renegotiated between the United States and petitioners regarding the Government Claims Issues." Respondent contends that petitioners' payments were made pursuant to the Government's exercise of its legal rights rather than the mutual agreement of the parties. Thus, respondent argues, there was no modification of the Government contracts in issue nor was there any agreement relating to them within the meaning of section 1481.

Petitioners, on the other hand, glossing over the egregious conduct which led to the necessity for the repayments, contend that the $185.1 million in repayments to the Government were not attributable to any alleged "illegal" or "illicit" conduct on petitioner's or SDC's part. Rather, according to petitioners, the repayments related solely to alleged misallocations of costs to Government contracts as indirect rather than direct costs and, to a much lesser extent, the misallocation of unallowable costs

to such contracts. Petitioners contend that the legality of these misallocations was never an issue before the grand jury or at the DOD audit or administrative level—only their correctness under the CAS and TINA regulations. Petitioners contend further that they never agreed with the Government's assertions that petitioner's or SDC's accounting practices were in violation of CAS or TINA, much less illegal or illicit. Petitioners also assert that the settlement agreements were nothing more than a mutual resolution of hotly disputed issues without any specific finding or admission of impropriety or noncompliance. Petitioners further contend that the allegations to which petitioner and SDC pled guilty under the Rockford and Seattle plea agreements were entirely separate and distinct from the repayments petitioner and SDC made under the Rockford and Seattle civil and administrative settlement agreements. Petitioners assert that, for Federal income tax purposes, there is no justification to link the criminal and administrative investigations. Thus, petitioners argue, the original contracts were valid and the repayments to the Government for which section 1481 treatment is claimed were not attributable to any "illegal" or "illicit" conduct; consequently, respondent's reliance on *Fleet Carrier Corp. v. Commissioner, supra,* is misplaced. Alternatively, petitioners claim that genuine issues of material fact exist which render the Government claims issues inappropriate for a motion for partial summary judgment.

Respondent, additionally, on the basis of *Fleet Carrier Corp. v. Commissioner, supra,* contends, among other assertions, that there must be some discussion of a fair or excessive profit to have a renegotiation within the meaning of section 1481. According to respondent, the settlement agreements here focused entirely on petitioners' illegal contracting practices and are completely devoid of any discussion of petitioners' profits. Thus, respondent argues, the repayments involved in the instant case do not constitute the recovery of excessive profits through renegotiation of Government contracts within the meaning of section 1481. We agree.

The taxpayer in *Fleet Carrier Corp. v. Commissioner, supra,* was an interstate carrier subject to the jurisdiction of the Interstate Commerce Commission (ICC). During 1943 and 1944, pursuant to its agreement with the Quartermaster Corps of the War Department, some of the rates the taxpayer

charged the Government for transportation services exceeded the rates authorized by the ICC. Following the war, it was determined that a regulated carrier could not legally charge the Government a higher freight rate than the rate authorized by the ICC and that no Government agency had the power to bind the Government to pay a higher rate. In 1953, the Comptroller General issued a "Certificate of Indebtedness" setting forth the overcharges for transportation services which the taxpayer rendered to the Government during 1943 and 1944. Following negotiations with the Department of Justice, the taxpayer paid a lesser sum in full settlement of the overcharges claimed by the Government. The taxpayer deducted the repayment on its tax return for 1953, but the Commissioner disallowed that deduction on the ground that the amount was not deductible as a business expense.

In *Fleet Carrier,* the Government's claim was based solely on a determination of the lowest applicable legal rate in effect in 1943 and 1944 compared to the amount the Government actually paid. The claim was not based on any allegation that the taxpayer had earned excessive profits on the transportation services furnished to the Government: no attempt was made to initiate any renegotiation proceedings. *Fleet Carrier Corp. v. Commissioner, supra* at 532-533. The Commissioner argued there that the deduction was specifically disallowed by section 3806 of the 1939 Code,[11] the predecessor of section

---

[11]Sec. 3806, as amended by sec. 701(c) of the Revenue Act of 1943, ch. 63, 58 Stat. 21, 90, provided in pertinent part as follows:

SEC. 3806. MITIGATION OF EFFECT OF RENEGOTIATION OF WAR CONTRACTS OR DIS-ALLOWANCE OF REIMBURSEMENT.

(a) REDUCTION FOR PRIOR TAXABLE YEAR.—

(1) EXCESSIVE PROFITS ELIMINATED FOR PRIOR TAXABLE YEAR.—In the case of a contract with the United States or any agency thereof, or any subcontract thereunder, which is made by the taxpayer, if a renegotiation is made in respect of such contract or subcontract and an amount of excessive profits received or accrued under such contract or subcontract for a taxable year (hereinafter referred to as "prior taxable year") is eliminated and, in a taxable year ending after December 31, 1941, the taxpayer is required to pay or repay to the United States or any agency thereof the amount of excessive profits eliminated or the amount of excessive profits eliminated is applied as an offset against other amounts due the taxpayer, the part of the contract or subcontract price which was received or was accrued for the prior taxable year shall be reduced by the amount of excessive profits eliminated. For the purposes of this section—

(A) The term "renegotiation" includes any transaction which is a renegotiation within the meaning of section 403 of the Sixth Supplemental National Defense Appropriation Act (Public 528, 77th Cong., 2d Sess.) or such section, as amended, any modification of one or more contracts with the United States or any agency thereof, and any agreement with the United States or any agency thereof in respect of one or more such contracts or subcontracts thereunder.

1481. *Id.* at 533. We held that the payment by the taxpayer did not amount to a renegotiation of Government contracts within the meaning of section 3806 of the 1939 Code and allowed the taxpayer to deduct for 1953 the entire amount paid in that year to the Government as money originally received under a "claim of right" but subsequently repaid. *Id.* at 538.

Section 3806 of the 1939 Code was recodified in section 1481 in the 1954 Code. Section 1481(a) defines excessive profits to include any amount which constitutes excessive profits as defined under the applicable Federal renegotiation act, any part of the contract price of a contract with the United States or any of its agencies, any part of the subcontract price of a subcontract under such contract, and any profits derived from one or more such contracts or subcontracts. Sec. 1481(a)(1)(B). We look first to the statutory language to interpret section 1481. *Reiter v. Sonotone Corp.,* 442 U.S. 330, 337 (1979). In interpreting statutory language, "we must not be guided by a single sentence or members of a sentence, but look to the provisions of the whole law, and to its object and policy." *United States v. The Heirs of Boisdore,* 49 U.S. (8 Howard) 113, 121 (1849). As explained in *Helvering v. Stockholms Enskilda Bank,* 293 U.S. 84, 93-94 (1934):

The intention of the lawmaker controls in the construction of taxing acts as it does in the construction of other statutes, and that intention is to be ascertained, not by taking the word or clause in question from its setting and viewing it apart, but by considering it in connection with the context, the general purposes of the statute in which it is found, the occasion and circumstances of its use, and other appropriate tests for the ascertainment of the legislative will.

For this purpose, explanatory legislative history may be referred to in interpreting the meaning of statutory language. *Harrison v. Northern Trust Co.,* 317 U.S. 476, 479 (1943); *Polyak v. Commissioner,* 94 T.C. 337, 340-341 (1990); *Cook v.*

---

(B) The term "excessive profits" includes any amount which constitutes excessive profits within the meaning assigned to such term by subsection (a) of Section 403 of the Sixth Supplemental National Defense Appropriate Act (Public 528, 77th Cong., 2d Sess.), as amended, any part of the contract price of a contract with the United States or any agency thereof, any part of the subcontract price of a subcontract under such a contract, and any profits derived from one or more such contracts or subcontracts.

(C) The term "subcontract" includes any purchase order or agreement which is a subcontract within the meaning assigned to such term by subsection (a) of Section 403 of the Sixth Supplemental National Defense Appropriation Act (Pub. L. 528, 77th Cong., 2d Sess.), as amended.

*Commissioner,* 90 T.C. 975, 984 (1988), affd. without published opinion 931 F.2d 59 (9th Cir. 1991).

Section 3806 of the 1939 Code defined renegotiation in substantially the same terms as found in section 1481, see *supra.* Consequently, the legislative history relating to section 3806 and case law interpreting it are relevant to our analysis of section 1481 here. Section 3806 of the 1939 Code had as its impetus section 403 of the Sixth Supplemental National Defense Appropriation Act, 1942, ch. 247, 56 Stat. 226, 245-246 (the first renegotiation act). The first renegotiation act provided for the renegotiation of all contracts and subcontracts made with the War Department, the Navy Department, or the Maritime Commissioner, regardless of whether these contracts or subcontracts contained a renegotiation or recapture clause, provided the final payment under the contract was not made before April 28, 1942 (the date the first renegotiation act was approved).

Under the first renegotiation act, the Secretary of each department was authorized and directed, whenever in his opinion excessive profits had been realized or were likely to be realized from any contract with the department or from any subcontract under such a contract, to require the contractor or subcontractor to renegotiate the contract price. Where, as a result of the renegotiation, an amount of the contract price was found to represent "excessive profits" already paid to the contractor or subcontractor, the secretary was authorized to recover those excessive profits. Section 403(b) of the first renegotiation act further required that a renegotiation clause be inserted in future contracts (or subcontracts) in excess of $100,000. The Supreme Court upheld the constitutionality of the first renegotiation act, as amended,[12] in *Lichter v. United States,* 334 U.S. 742 (1948).

---

[12]The Supreme Court considered the renegotiation act to consist of the following: sec. 403, Sixth Supplemental National Defense Appropriation Act, 1942, ch. 247, 56 Stat. 226, 245-246; tit. VIII, Renegotiation of War Contracts, Revenue Act of 1942, ch. 619, 56 Stat. 798, 982-985; Military Appropriation Act, 1944, ch. 185, sec. 1, 57 Stat. 347-348; an Act to prevent the payment of excessive fees or compensation in connection with the negotiation of war contracts, ch. 239, 57 Stat. 564-565; tit. VII, Renegotiation of War Contracts, and tit. VIII, Repricing of War Contracts, Revenue Act of 1943, ch. 63, 58 Stat. 21, 78-93; an Act to extend through Dec. 31, 1945, the termination date under the Renegotiation Act, ch. 210, 59 Stat. 294-295. *Lichter v. United States,* 334 U.S. 742, 745 n.1 (1948).

The first renegotiation act was enacted soon after the United States' entry into World War II—a time when the Government urgently needed to gear up quickly for war. During times of such rapid mobilization:

the war procuring agencies cannot use normal methods of procurement. The pressing need for speed requires the abandonment of drawn-out negotiation and the careful surveys of all relevant factors which sound purchasing would otherwise require. Competition necessarily wanes and no longer offers an adequate guide to the prices which should be paid. Above all, the forecasting of costs of production becomes, in large measure, a matter of informed guessing rather than of real cost analysis. This is true in the case of new products, new plants, and new producers; it is likewise true, though perhaps in lesser degree, whenever the quantities to be manufactured are sharply increased over pre-war amounts. Accordingly, advance prices quoted in good faith by manufacturers in a large number of cases have little relation to costs actually experienced in the course of production. Furthermore, many manufacturers feel unable to quote firm prices without including reserves to cover many contingencies the occurrence of which might skyrocket their costs, and so overturn all their estimates. [*Lichter v. United States, supra* at 762-763 n.7.]

Congress, consequently, enacted the first renegotiation act as a means to curtail war profiteering without hindering production of the equipment and supplies desperately needed to win the war. *Lichter v. United States, supra* at 754-765. See Hearings on H.R. 6868 Before the Subcomm. of the Senate Comm. on Appropriations, 77th Cong., 2d Sess. 22-31 (1942); floor debate on H.R. 6868, 88 Cong. Rec. 3107-3108, 3118, 3137, 3379-3381, 3394-3396 (1942); H. Rept. 733, 78th Cong., 1st Sess. 1-5 (1943) (Investigation of the Progress of the War Effort); H. Rept. 871, 78th Cong., 1st Sess. 34-35 (1943) (to accompany H.R. 3687 (the Revenue Bill of 1943)).

The first renegotiation act, however, did not address the taxability or deductibility in any year of the excessive profits repaid to the Government as a result of a renegotiation. Without an express provision, the repayments presumably would have been deductible in the year repaid under the claim of right doctrine. *Fleet Carrier Corp. v. Commissioner,* 37 T.C. at 534. Increased tax rates in effect for the year of repayment of the excessive profits over the year in which the contractor received the payments from the Government, however, generally would have resulted in a greater tax benefit for the contractor. I.T. 3577, 1942-2 C.B. 163. Consequently, the

Internal Revenue Service (the Service) issued ruling I.T. 3577, *supra,* in which the Service stated its position that:

only the amount of such profits *in excess of the Federal income and excess profits taxes paid or assessed thereon* should be repaid by the contractor or subcontractor, and no refund or abatement of such taxes should be made, since the taxes should be considered as a recapture of a portion of the excessive profits and as such a proper offset against the total excessive profits. The remainder of the excessive profits would be recaptured through repayment thereof to the Government by the contractor or subcontractor. The repayment should not be allowed as a deduction in the income and excess profits tax returns of the taxpayer for any taxable year. To do so would result in a double tax benefit where the income and excess profits taxes have been offset against the excessive profits. * * * [1942-2 C.B. at 164.]

Section 508 of the Revenue Act of 1942, ch. 619, 56 Stat. 798, 964 added section 3806 to the Internal Revenue Code of 1939. In *Fleet Carrier Corp. v. Commissioner, supra* at 535, we explained that:

Section 3806 was * * * added to the 1939 Code by the Revenue Act of 1942 in order to effectuate this ruling [I.T. 3577] into law. S. Rept. No. 1631, 77th Cong., 2d Sess., sec. 507. It is, therefore, apparent that the sole intent of Congress in enacting section 3806 was to provide for the tax treatment of eliminated excessive profits in a renegotiated Government contract. A careful review of the legislative history discloses no other broader purpose. Indeed, the almost total lack of explanation in the committee reports concerning section 3806 was evidently caused by a belief that the scope and content of the ruling and the statute were clear and unambiguous.

We concluded in *Fleet Carrier Corp. v. Commissioner, supra* at 536, that:

A renegotiation is the redetermination of a contract price in the light of later actual experience in order to eliminate excessive profits which were created under the original contract price. This redetermination or modification of the original valid contract price is made either by agreement between the parties or by a board in a formal hearing. * * *

The Renegotiation Act of 1951, ch. 15, 65 Stat. 7, patterned after the first renegotiation act, as amended, was enacted as a result of the Korean conflict. Again, Congress was concerned with the elimination of excessive profits on defense contracts during a period of rapid mobilization without interfering with the war production. Hearings before the Committee on Ways and Means on Extending and Amending the Renegotiation Act

(of 1951), 90th Cong., 2d Sess. 15-16 (Mar. 11-12, 1968); *Mason & Hanger-Silas Mason Co. v. United States,* 207 Ct. Cl. 106, 116, 518 F.2d 1341, 1346-1347 (1975). Under the Renegotiation Act of 1951, total profits of a contractor during a fiscal year from all renegotiable contracts and subcontracts were subject to review by the renegotiation board to determine whether that profit was excessive. 65 Stat. 7, 8, 12; S. Rept. 1385, 90th Cong., 2d Sess. 2 (1968) (to accompany H.R. 17324 Renegotiation Amendments Act of 1968).

The Renegotiation Act of 1951 was originally set to expire on December 31, 1953. Sec. 102(a) of the Renegotiation Act of 1951. However, it was extended on a number of occasions and, thus, did not expire until September 30, 1976. Act to Extend the Renegotiation Act of 1951, Pub. L. 94-185, 89 Stat. 1061. Activities of the renegotiation board terminated on March 31, 1979. Pub. L. 95-431, tit. V, 92 Stat. 1021, 1043. The following excerpt, relating to the extension of the Renegotiation Act of 1951 until June 30, 1971, succinctly summarizes the Congress' views regarding the need to maintain the statutory renegotiation provisions:

> in view of existing international conditions, the continuation of the Renegotiation Act is in the national interest. The renegotiation process allows an after-the-fact review of the profits on renegotiable contracts and subcontracts relating to the national defense and space efforts. This provides a further check on the reasonableness of the profits and prices that the Government has to pay in order to maintain its defense commitments.
>
> Modern military and space procurement is characterized by changing technical requirements and increasing complexity. The nature of this procurement means there often is a lack of established market costs or prices to guide procurement officers, and accordingly the use of negotiated contracts is necessary for the large majority of the dollar amount of these procurements. This includes contracts negotiated with sole-source suppliers as well as contracts negotiated with some degree of price competition. * * *
>
> [S. Rept. 1385, *supra* at 3.]

It is apparent that Congress considered renegotiation to be a tool for the recovery of abnormally high profits which generally resulted when rapid mobilization or the development of complex or innovative equipment made it difficult for the contracting parties to determine initially a fair and reasonable contract price. The renegotiation process, thus, was intended, so to speak, to give the Government one more bite at the apple to recapture a contractor's excessive profits resulting from

defense contracts. See floor debate on H.R. 7378 (Revenue Bill of 1942), 88 Cong. Rec. 8049-8052 (1942); Hearings on H.R. 6868 Before the Subcomm. of the Senate Comm. on Appropriations, *supra;* H. Rept. 733, *supra;* S. Rept. 627, 78th Cong., 1st Sess. 32-33 (1943) (to accompany H.R. 3687 (Revenue Act of 1943)). We found nothing in the legislative history of section 1481 which would indicate Congress intended that section to apply to the recapture of anything other than abnormally high profits on defense contracts.

Neither the CAS nor TINA contract clause, on the other hand, is concerned with excessive profits arising from actual operations. The CAS, promulgated by the Cost Accounting Standards Board (CASB) pursuant to the mandate of the Defense Production Act Amendments, Pub. L. 91-379, sec. 103, 84 Stat. 796 (but see sec. 5 of the Office of Federal Procurement Policy Act Amendments of 1988, Pub. L. 100-679, 102 Stat. 4055, 4058, which created a new, independent CASB within the Office of Federal Procurement Policy), are designed to achieve uniformity and consistency in the cost accounting practices followed by certain defense contractors and subcontractors and certain nondefense contractors. 41 U.S.C. sec. 422 (1988); 4 C.F.R. sec. 301.2 (1991); 48 C.F.R. secs. 30.101; 30.401-20 (1991). Under regulations of the CASB, a contractor generally must disclose in writing his cost accounting practices before the contract is awarded. 4 C.F.R. sec. 351 (1991). The contractor, moreover, must consistently follow the disclosed cost accounting practices in accumulating and reporting contract performance cost data concerning the contract. In addition, the contractor must agree to an adjustment of the contract price, or cost allowance, if he fails to comply with an applicable cost accounting standard or to follow any disclosed cost accounting practice if the failure to comply results in any increased costs paid by the Government. The adjustment must provide for the recovery of the increased costs to the Government resulting from the noncompliance plus interest.[13]

---

[13]The contract clause generally required to be inserted in all negotiated national defense prime contracts and subcontracts relating to compliance with cost accounting standards provides in pertinent part as follows:

COST ACCOUNTING STANDARDS

(a) Unless the Cost Accounting Standards Board has prescribed rules or regulations exempting the contractor or this contract from standards, rules, and regulations promulgated pursuant to 50

4 C.F.R. Part 331 (1991); AiResearch Manufacturing Co., (ASBCA No. 20998), 76-2 B.C.A. (CCH) par. 12,150 (Nov. 29, 1976), affd. on reconsideration 77-1 B.C.A par. 12,546 (ASBCA 1977).

TINA (sometimes referred to as the defective pricing statute), added by Pub. L. 87-653, 76 Stat. 528, 10 U.S.C. sec. 2306(f) (1962) (now at 10 U.S.C. sec. 2306a (1988) (cost or pricing data: truth in negotiating), on the other hand, requires a contractor to furnish a certificate in which he attests to the

---

U.S.C. App. 2168 (Pub. L. 91-379, August 15, 1970), the contractor, in connection with this contract shall:

(1) By submission of a Disclosure Statement, disclose in writing his cost accounting practices as required by regulations of the Cost Accounting Standards Board. The practices disclosed for this contract shall be the same as the practices currently disclosed and applied on all other contracts and subcontracts being performed by the contractor and which contain a Cost Accounting Standards clause.

    *  *  *  *  *  *  *

(2) Follow consistently his cost accounting practices in accumulating and reporting contract performance cost data concerning this contract. If any change in cost accounting practices is made for purposes of any contract or subcontract subject to Cost Accounting Standards Board requirements, the change must be applied prospectively to this contract, and the Disclosure Statement must be amended accordingly. If the contract price or cost allowance of this contract is affected by such changes, adjustment shall be made in accordance with subparagraph (a)(4) or (a)(5) below, as appropriate.

(3) Comply with all Cost Accounting Standards in effect on the date of award of this contract or if the contractor has submitted cost or pricing data, on the date of final agreement on price as shown on the contractor's signed certificate of current cost or pricing data. The contractor shall also comply with any Cost Accounting Standard which hereafter becomes applicable to a contract or subcontract of the contractor. Such compliance shall be required prospectively from the date of applicability to such contract or subcontract.

(4)(A) Agree to an equitable adjustment as provided in the changes clause of this contract if the contract cost is affected by a change which, pursuant to (3) above, the contractor is required to make to his cost accounting practices.

(4)(B) Negotiate with the contracting officer to determine the terms and conditions under which a change may be made to a cost accounting practice, other than a change made under other provisions of this subparagraph (4): *Provided,* That no agreement may be made under this provision that will increase costs paid by the United States.

(4)(C) When the parties agree to a change to a cost accounting practice, other than a change under (4)(A) above, negotiate an equitable adjustment as provided in the changes clause of this contract.

(5) Agree to an adjustment of the contract price or cost allowance, as appropriate, if he or a subcontractor fails to comply with an applicable Cost Accounting Standard or to follow any cost accounting practice consistently and such failure results in any increased costs paid by the United States. Such adjustment shall provide for recovery of the increased costs to the United States together with interest thereon computed at the rate determined by the Secretary of the Treasury pursuant to Pub. L. 92-41, 85 Stat. 97, or 7 percent per annum, whichever is less, from the time the payment by the United States was made to the time the adjustment is effected.

(b) If the parties fail to agree whether the contractor or a subcontractor has complied with an applicable Cost Accounting Standard, rule, or regulation of the Cost Accounting Standards Board and as to any cost adjustment demanded by the United States, such failure to agree shall be a dispute concerning a question of fact within the meaning of the disputes clause of this contract.

[4 C.F.R. sec. 331.50 (1991).]

fact that: (1) Complete cost and pricing data, current as of the date[1] of the original proposal, have been submitted; (2) all significant changes in the data since that date through the date of agreement on the negotiated price or fee also have been submitted, and no more recent significant change in such data was known to the contractor at the time of executing the certificate, and (3) all the data submitted are correct. 10 U.S.C. sec. 2306a (1988); *Cutler-Hammer, Inc. v. United States,* 189 Ct. Cl. 76, 84, 416 F.2d 1306, 1311 (1969). The purpose of the statute is to have contractors furnish cost information which is complete, accurate, and on a current-price basis. *Lockheed Aircraft Corp., Lockheed-Ga. Co. Div. v. United States,* 193 Ct. Cl. 86, 92, 432 F.2d 801, 805 (1970); *Cutler-Hammer, Inc. v. United States, supra.* Contracts subject to TINA must include a clause providing for the reduction in the contract price and modification of the contract to reflect that price adjustment where the contract price had been increased by a significant sum as a result of defective pricing and the contracting officer had relied on the defective data in determining the contract price.[14] 10 U.S.C. sec. 2306a(d) (1988);

---

[14]The basic regulatory provisions relating to cost and price negotiation policies and procedures applicable to negotiated prime contracts and subcontracts under them are set forth in 48 C.F.R. Subpart 15.8—Price Negotiation (1991). Under 48 C.F.R. sec. 15.804-8 (1991), the following contract clause must be inserted in a negotiated contract when it is contemplated that cost or pricing data will be required from the contractor or a subcontractor:

PRICE REDUCTION FOR DEFECTIVE COST
OR PRICING DATA (JAN. 1991)

(a) If any price, including profit or fee, negotiated in connection with this contract, or any cost reimbursable under this contract, was increased by any significant amount because (1) the Contractor or a subcontractor furnished cost or pricing data that were not complete, accurate, and current as certified in its Certificate of Current Cost or Pricing Data, (2) a subcontractor or prospective subcontractor furnished the Contractor cost or pricing data that were not complete, accurate, and current as certified in the Contractor's Certificate of Current Cost or Pricing Data, or (3) any of these parties furnished data of any description that were not accurate, the price or cost shall be reduced accordingly and the contract shall be modified to reflect the reduction.

(b) Any reduction in the contract price under paragraph (a) above due to defective data from a prospective subcontractor that was not subsequently awarded the subcontract shall be limited to the amount, plus applicable overhead and profit markup, by which (1) the actual subcontract or (2) the actual cost to the Contractor, if there was no subcontract, was less than the prospective subcontract cost estimate submitted by the Contractor; *provided,* that the actual subcontract price was not itself affected by defective cost or pricing data.

(c)(1) If the Contracting Officer determines under paragraph (a) of this clause that a price or cost reduction should be made, the Contractor agrees not to raise the following matters as a defense—

(i) The Contractor or subcontractor was a sole source supplier or otherwise was in a superior bargaining position and thus the price of the contract would not have been modified even if accurate, complete, and current cost or pricing data had been submitted;

*Cutler-Hammer, Inc. v. United States,* 416 F.2d at 1309; *Lockheed Aircraft Corp., Lockheed-Ga. Co. Div. v. United States,* 432 F.2d at 803. Components a contractor purchases from a subcontractor also are subject to the defective pricing clause. *Lockheed Aircraft Corp., Lockheed-Ga. Co. Div. v. United States, supra* at 805. The prime contractor, thus, bears the responsibility, as far as the Government is concerned, for the overstatement of costs caused by its subcontractor's defective pricing violations. *Id.* at 806.

CAS and TINA are concerned with the costs on which the Government contracting officer and the contractor initially rely in negotiating the contract price. They are negotiating tools to help the contracting officer arrive at a fair and reasonable contract price in the first place. In a sense CAS and TINA put the contracting officer on a more nearly level playing field with the contractor in the negotiation of the contract price. See

---

(ii) The Contracting Officer should have known that the cost or pricing data in issue were defective even though the Contractor or subcontractor took no affirmative action to bring the character of the data to the attention of the Contracting Officer;

(iii) The contract was based on an agreement about the total cost of the contract and there was no agreement about the cost of each item procured under the contract; or

(iv) The Contractor or subcontractor did not submit a Certificate of Current Cost or Pricing Data.

(2)(i) Except as prohibited by subdivision (c)(2)(ii) of this clause, an offset in an amount determined appropriate by the Contracting Officer based upon the facts shall be allowed against the amount of a contract price reduction if—

(A) The Contractor certifies to the Contracting Officer that, to the best of the Contractor's knowledge and belief, the Contractor is entitled to the offset in the amount requested; and (B) The Contractor proves that the cost or pricing data were available before the date of agreement on the price of the contract (or price of the modification) and that the data were not submitted before such date.

(ii) An offset shall not be allowed if—

(A) The understated data was known by the Contractor to be understated when the Certificate of Current Cost or Pricing Data was signed; or

(B) The Government proves that the facts demonstrate that the contract price would not have increased in the amount to be offset even if the available data had been submitted before the date of agreement on price.

(d) If any reduction in the contract price under this clause reduces the price of items for which payment was made prior to the date of the modification reflecting the price reduction, the Contractor shall be liable to and shall pay the United States at the time such overpayment is repaid—

(1) Simple interest on the amount of such overpayment to be computed from the date(s) of overpayment to the Contractor to the date the Government is repaid by the Contractor at the applicable underpayment rate effective for each quarter prescribed by the Secretary of the Treasury under 26 U.S.C. 6621(a)(2); and

(2) For Department of Defense contracts only, a penalty equal to the amount of the overpayment, if the Contractor or subcontractor knowingly submitted cost or pricing data which were incomplete, inaccurate, or noncurrent.

[48 C.F.R. sec. 52.215-22 (1991).]

Introductory Remarks of Senator Roth on S. 940 (a bill entitled the Defense Procurement Program Integrity Act), 131 Cong. Rec. S4324 (daily ed. Apr. 17, 1985). CAS and TINA, thus, focus on the beginning of the contract, unlike a renegotiation which looks back over the operations of the defense contractor to see if the pricing of the contract has resulted in unreasonable and unjustifiable profits.

Moreover, we could find no indication that a price adjustment under the CAS or TINA contract clause could be used only if the contract resulted in a profit on the contract. Indeed, it seems to us from our research that the contractor conceivably could realize a loss on the contract and still be subject to a price redetermination because of a CAS or TINA violation.

From our research, we are convinced that Congress never intended the provisions of section 1481 to extend to a factual situation as presented by these cases. Consequently, we conclude that repayments under the TINA and CAS price adjustment clauses do not constitute the recovery of excessive profits through renegotiation within the meaning of section 1481.

We find support for our conclusion from the implications of later legislation. "When there is nothing better to guide us to the meaning of the statute, the actions of later Congresses 'should not be rejected out of hand.'" *Darby v. Commissioner,* 97 T.C. 51, 59 (1991) (quoting *Andrus v. Shell Oil Co.,* 446 U.S. 657, 666 n.8 (1980)). See also the cases cited thereat.

Section 11801(a)(37) of the Omnibus Budget Reconciliation Act of 1990 (OBRA-90), Pub. L. 101-508, 104 Stat. 1388, 1388-521, repealed section 1481, effective November 5, 1990. OBRA-90 section 11801(a)(37) initially was introduced in H.R. 5415, the Deadwood Act of 1990. The provisions of H.R. 5415 later were included in H.R. 5822, the Technical and Miscellaneous Revenue Act of 1990, portions of which then were included in OBRA-90. H. Conf. Rept. 101-964, at 1142 (1990); H. Rept. 101-894, at 9, 37 (1990).

The reasons for the repeal of the "deadwood" provisions, including section 1481, are set forth as follows (H. Rept. 101-894, *supra* at 37):

Title II.—Repeal of Expired or Obsolete Provisions; Treasury Studies

A. Repeal of Expired or Obsolete Provisions of the Internal Revenue Code of 1986 (secs. 201-221 of bill)

*Present Law*

The Internal Revenue Code of 1986 contains numerous provisions which are no longer used in computing current taxes or are little used and are of minor importance. These types of provisions are popularly referred to as "deadwood" provisions.

### Reasons for Change

The committee wishes to simplify the Internal Revenue Code of 1986 by deleting those provisions which are obsolete.

### Explanation of Provisions

The bill repeals and amends numerous sections of the Code. The bill deletes sections, subsections, and other provisions which dealt with past years, situations which were narrowly defined and unlikely to recur, as well as provisions which have outlived their usefulness. While these provisions are an attempt to simplify the Code by deleting "deadwood", they do not attempt to achieve simplification through substantive changes in the tax law.

At the time Congress repealed section 1481, the Renegotiation Act of 1951 had expired and the renegotiation board had been terminated. The Government contracting regulations, including CAS and TINA, requiring price adjustments for various reasons remained in force however. We can infer from this that Congress did not perceive that price adjustments under these Government contracting regulations result in a recapture of excessive profits through a renegotiation within the meaning of section 1481.

We also note, for what it is worth, that from time to time since its expiration, bills have been introduced in Congress to revive the Renegotiation Act of 1951. A driving interest for the sponsors of this legislation has been the all-too-familiar horror stories of the $44 light bulb, $640 toilet seat, and $7,622 coffee maker charged the Government by certain defense contractors. See 133 Cong. Rec. H6152 (daily ed. July 9, 1987); 131 Cong. Rec. S4325 (daily ed. Apr. 17, 1985); 131 Cong. Rec. S7179, S7184-S7187 (daily ed. May 24, 1985). Thus, it appears that at least some members of Congress have seen a different role for renegotiation than for CAS and TINA.

The parties focused considerable attention on the question of whether the settlement agreements constitute a modification of the Government contracts or an agreement relating to them within the meaning of section 1481. We need not address this issue in light of our holding that the repayments under the TINA and CAS price adjustment clauses do not constitute the

recovery of excessive profits through renegotiation within the meaning of section 1481. We note, however, that from our research we believe that a price readjustment under CAS or TINA does not result in a contract modification or agreement relating to a Government contract within the meaning of section 1481.

Respondent contends in the alternative that the payments under the Rockford civil settlement agreement and the Rockford administrative settlement agreement were not designated to specific Government contracts or agreements as required by section 1481. Petitioners counter that respondent's alternative position raises genuine issues of material facts which would necessitate a trial. Our resolution of this case on the basis that there was no recovery of excessive profits through renegotiation within the meaning of section 1481 renders these factual issues unnecessary to the resolution of the Government claims issues; thus, a summary adjudication is not precluded here. See *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-248 (1986).

Petitioners further argue that there is no legal support for respondent's position that section 1481 requires a contract-by-contract allocation. Since we have found that the payments at issue were not made pursuant to a renegotiation within the meaning of section 1481, we need not address this alternative argument. We also need not address the more serious consideration of whether an allowance for the payments involved here would be precluded under the public policy doctrine. We have not addressed the allocation of the payments among fines, penalties, costs, interest, or restitution since questions relating to the characterization of the payments are not before the Court.

Based on the above, we conclude that section 1481 does not apply to the repayments at issue in the instant case. Accordingly, respondent's motions for partial summary judgment will be granted.

To reflect the foregoing,

*An appropriate order will be issued.*