T.C. Memo. 2013-247

UNITED STATES TAX COURT

JOHN T. O'DONNELL AND ELLEN J. NORRIS O'DONNELL, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 22230-08L.               Filed October 29, 2013.

<u>Donald G. Koch</u>, <u>Jacob Zelmanovitz</u>, <u>John P. Fazzio</u>, and <u>Jacob Delmano</u>,
for petitioners.

<u>Justin L. Campolieta</u>, <u>Frederick C. Mutter</u>, <u>Mimi M. Wong</u>, and <u>Rose E.</u>
<u>Gole</u>, for respondent.

MEMORANDUM OPINION

COHEN, <u>Judge</u>:  This case was commenced under section 6330 in response

to a notice of determination concerning collection action that sustained a levy with

[*2] respect to petitioners' unpaid Federal income tax liabilities for 2000, 2001, 2003, 2004, 2005, and 2006. The issue for decision is whether the Appeals settlement officer abused his discretion in refusing petitioners' suggested installment agreement. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Background

All of the facts have been stipulated, and the stipulated facts are incorporated as our findings by this reference. Petitioners resided in New York at the time they filed their petition.

On or about April 22, 2005, a Final Notice--Notice of Intent to Levy and Notice of Your Right to a Hearing (April 2005 notice of levy) relating to the collection of petitioners' outstanding income tax liabilities for 1997, 1998, 1999, and 2002 was sent to petitioners. Petitioners did not request a section 6330 hearing in response to this notice.

On or about April 23, 2007, petitioners' representative, Ronny Buni, mailed to the Internal Revenue Service (IRS) a letter transmitting a Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals, dated April 23, 2007, as well as copies of petitioners' Forms W-2,

[*3] Wage and Tax Statement, for the taxable year 2006. In the letter, Buni proposed, as a collection alternative, for the IRS to consider an installment agreement with a monthly payment starting at $2,500 and increasing to $3,000 monthly for the subsequent year and eventually to $3,500 for the second subsequent year.

On or about August 8, 2007, a Final Notice--Notice of Intent to Levy and Notice of Your Right to a Hearing (August 2007 notice of levy) was sent to petitioners. The August 2007 notice of levy related to the collection of petitioners' outstanding income tax liabilities for 1997, 1998, 1999, 2000, 2001, 2002, 2003, 2004, 2005, and 2006.

On or about August 21, 2007, petitioners submitted to the IRS a Form 12153, Request for a Collection Due Process or Equivalent Hearing. Although petitioners listed the taxable years 1997 through 2006 on their August 21, 2007, Form 12153, they had forfeited their right to administrative review by the Office of Appeals with respect to 1997, 1998, 1999, and 2002 because they did not request a hearing in response to the April 2005 notice of levy.

For 2000, 2001, 2003, 2004, 2005, and 2006, petitioners' outstanding liabilities consisted only of the assessed balance of tax shown as due but unpaid on

[*4] joint income tax returns filed by petitioners plus statutory additions to tax and statutory interest accruals.

On or about December 18, 2007, Settlement Officer Michael Smith sent to petitioners a letter for the purpose, among other things, of scheduling a telephone hearing and requesting that petitioners provide the following information: (1) an updated Form 433-A; (2) each of petitioners' final pay statements for 2007; (3) petitioners' most recent checking account statements; and (4) a copy of the yearend account statements for petitioners' Treasury bond, section 401(k) retirement, CREF money market, and CREF stock accounts.

On or about February 6, 2008, petitioners' representative Buni sent two packages to the settlement officer. The first package was a fax transmitting an updated Form 433-A dated February 6, 2008, and signed by Buni. The second was a package of documents containing additional financial information. On or about February 8, 2008, a telephone conference was held between Buni and the settlement officer, during which the parties discussed a potential installment agreement involving an upfront lump-sum payment out of current assets.

On or about April 2, 2008, the settlement officer contacted the law firm representing petitioner and spoke with Donald Koch of that firm. Koch informed the settlement officer that Buni was no longer with the firm but that Koch would

[*5] be representing petitioners on behalf of the firm. The settlement officer continued discussions with Koch concerning a potential installment agreement proposal by petitioners and the possibility of a potential upfront lump-sum payment by petitioners.

On or about April 29, 2008, the settlement officer and Koch discussed by telephone a potential installment agreement. The settlement officer inquired as to whether petitioners' investment accounts, listed as assets on line 13 of the Form 433-A, could be liquidated to provide for an upfront lump-sum payment as a start to a possible five-year installment agreement. Koch indicated that he had not yet discussed the investment accounts with petitioners but that he would discuss a possible liquidation of those accounts and get back to the settlement officer within 7 to 10 days.

On or about May 27, 2008, the settlement officer and Koch had a telephone conversation, during which the settlement officer requested that petitioners make a proposal for a collection alternative. Koch indicated that he still needed to speak with petitioners. However, he further indicated that petitioners had significant outstanding liabilities to other creditors, including New York State and credit card companies, and that emptying the investment accounts and paying only the IRS might not be a feasible course of action, because the other creditors could

[*6] commence collection efforts with respect to income and assets needed to pay the IRS.

On or about June 11, 2008, the settlement officer and Koch had a telephone conversation and discussed a number of matters regarding petitioners' liabilities. Koch pointed out that there were two errors on the February 6, 2008, Form 433-A. First, the statement incorrectly listed petitioners' CREF and section 401(k) retirement accounts as assets. Koch indicated that these inclusions were improper because petitioners were unable to access those funds. In response, the settlement officer requested that petitioners substantiate that the retirement funds were unavailable, and, if so, then they would not be taken into consideration in determining petitioners' ability to pay.

Second, Koch indicated that petitioners' other investment accounts had previously been liquidated to pay petitioners' 2007 Federal income tax liability and should not have been listed as current assets on the statement. In response, the settlement officer noted that the funds held in the liquidated accounts exceeded petitioners' total 2007 Federal income tax liability and asked that petitioners provide an accounting of how the additional funds were spent. Koch agreed to provide this information, as well as updated financial statements, also requested by Settlement Officer Smith, including a revised Form 433-A.

**[*7]**   During the June 11, 2008, conference, Koch proposed an installment agreement commencing with a monthly payment of between $1,500 and $1,800 that would increase after a year to between $3,000 and $4,000 a month.  In response, the settlement officer indicated that, according to his calculations and given petitioners' current net monthly income, petitioners could afford a larger monthly installment payment.  The settlement officer also expressed his concern that a number of petitioners' claimed living expenses exceeded the national and local standard allowances.  Without an agreement that would pay the liability in full within five years, many of these conditional living expenses would not be allowed in determining petitioners' ability to pay.

On or about July 23, 2008, Koch faxed to the settlement officer a package of documents including a letter from Koch, supporting financial documentation, and an updated Form 433-A dated July 22, 2008, signed by petitioners.  The cover letter from Koch explained that petitioners' nonretirement investment account was closed on September 12, 2007, after withdrawal of $41,807.67, and the funds were transferred into an account held by petitioners' 28-year-old son.  Of the total amount, $21,747.50 was returned to petitioners and used to pay New York State and Federal 2007 income tax liabilities and the balance remained in petitioners' son's account and was used to pay his tuition, tuition loans, credit card debt, and

[*8] living expenses. The July 22 Form 433-A reflected gross monthly income of $40,034; cash on hand of $8,982; investments of $110,860; and a vehicle valued at $2,575. That statement reported monthly expenses of $42,195, including the following:

| | |
|---|---:|
| Food, clothing, and misc | $1,728 |
| Housing and utilities | 7,426 |
| Vehicle operating costs | 1,163 |
| Public transportation | 358 |
| Out-of-pocket health care | 1,377 |
| Court ordered payments | 780 |
| Tuition/fees | 904 |
| Legal fees | 3,900 |
| Taxes | 17,726 |
| Credit card payments | 6,833 |
| | 42,195 |

Included with the documents petitioners submitted to the settlement officer on June 23, 2008, was a copy of a billing statement from counsel to petitioners that described services as:

> Reviewed form 433A and bankruptcy analysis spreadsheets in preparation for meeting with clients. Prepared outline. Meeting with Dr. and Mrs. O'Donnell - reviewed all calculations and explained that bankruptcy is the only total solution to the problem but they need to wait before filing. We will try to reach a settlement at the CDP hearing to tide them over for one year or some portion thereof, and then file an Offer in Compromise based on a bankruptcy which should hold off IRS collection for another year or more.

[*9] On or about August 4, 2008, Koch faxed another letter to the settlement officer, stating, among other things:

> I have included the minimum amount needed to pay monthly credit card charges as an allowable expense. If Dr. O'Donnell fails to meet his duties to these creditors, the debt will quickly become a judgment and the creditors will levy his earnings. Not only will such an outcome force him to default on any installment arrangement that we agree to, but it is likely to force him into bankruptcy. Exercise of his right to bankruptcy relief will be costly to the IRS since more than half of his tax debt is dischargeable now and nearly another 40% will become dischargeable within a year following conclusion of the CDP hearing.

The settlement officer responded on August 5, 2008, in a voicemail message that he memorialized in his notes as follows:

> It was clear from the information that you sent me, that Dr. O'Donnell's intent is to delay collection as much as he can until all the liability is dischargeable in bankruptcy; its his intent to pay his credit card bills and New York State Taxes in preference to payment of the federal taxes. There is information that you sent me that he has been making large cash withdrawals from his own Morgan Stanley Account and putting it into the checking account of his stepson Jeremy Norris. You know which all of this is the intent to defeat collection. I asked you a few weeks ago whether he was sincere in wanting to take care of his taxes. The information that you sent me convinced me that he's not sincere, that he's just attempting to not pay. So I have sustained the levy; its my opinion that the collection office should levy as much as possible prior to the taxpayer filing bankruptcy which is his intent and especially so in consideration the fact that he's transferring assets, ok.

**[*10]** On or about August 5, 2008, the settlement officer spoke with Koch and communicated his determination to sustain the proposed collection action.

The settlement officer reviewed the information petitioners submitted and determined the amounts of petitioners' allowable expenses. He disallowed completely the expenses for "Tuition/Fees" and "Credit Card Payments"; applied standard allowances for "Food, Clothing, and Misc", "Housing and Utilities", "Vehicle Operating Costs", and "Public Transportation" expenses; and allowed entirely--without verification--the expenses claimed for "Out-of-Pocket Health Care", "Court Ordered Payments", "Taxes", and "Legal Fees".

The settlement officer determined petitioners' total allowable expenses to be $31,247, as follows:

| | |
|---|---:|
| Food, clothing, and misc | $1,370 |
| Housing and utilities | 5,451 |
| Vehicle operating costs | 480 |
| Public transportation | 163 |
| Out-of-pocket health care | 1,377 |
| Court ordered payments | 780 |
| Tuition/fees | 0 |
| Legal fees | 3,900 |
| Taxes | 17,726 |
| Credit card payments | 0 |
| | 31,247 |

On August 6, 2008, the settlement officer issued the Notice of Determination Concerning Collection Action(s) Under Section 6320 and/or 6330

[*11] sustaining respondent's proposed use of a levy to collect petitioners'

outstanding income tax liabilities for 2000, 2001, 2003, 2004, 2005, and 2006.

The notice explained:

> We determine that the collection office may levy as proposed to collect these taxes. The taxpayer's payment proposal is not viable because it does not offer in payment any of the taxpayer's investment assets which the taxpayer acknowledged he could obtain. The taxpayer did not provide complete financial information in regard to substantial withdrawals [from] his Morgan Stanley account. The information provided establishes that he recently moved some of the funds in these accounts to a checking account owned by his step son. In addition, the proposal initially offers just $1500 monthly from current income which exceeds $40,000 per month. The proposed payment amount is not consistent with the taxpayer's ability to pay when the government's allowable expense standards are employed. Information provided establishes the taxpayer's intent to simply "hold off IRS collection" until a bankruptcy can be filed.

> \* \* \* \* \* \* \*

> The taxpayer's returns for the years 2000 through 2003 were filed at the end of 2004. The 2004 and 2005 returns were filed in February 2007. The 2006 return was the first return in ten years to have been filed timely. All these returns reflected a substantial underpayment of the tax on the return.

> John O'Donnell is a physician at St. Clare's Hospital in New Jersey. He is also self-employed as a psychiatric consultant. Ellen O'Donnell is a nurse working at St. Luke's Hospital in Manhattan. These assessments are all the result of returns the taxpayers filed without full payment of the liability. The taxpayer's 2006 income was $417,038 or $34,753 per month on average. The taxpayer's 2007 income grew to $49,672 or $41,472 per month on average.

> \* \* \* \* \* \* \*

[*12] Subsequent information provided by your attorney establishes that this payment proposal was not intended to be a means to pay your full liability over the long term. Notes of your April 4th meeting with Mr. Koch establish that the $1500 per month installment payment proposal was intended to "hold off IRS collection" for "one year or a portion thereof" pending a bankruptcy filing.

Aside from your current income, you have not fully disclosed the availability of liquid assets to pay these liabilities. Your liquid assets as shown on your 2007 financial statement include $159,222 in investments and $35,931 in the bank.

Appeals' discussions with Mr. Buni and Mr. Koch addressed the availability of your investment accounts and pension funds. Your representative reported on June 11th that these funds in Morgan Stanley investment accounts and in TIAA-CREF accounts had been used to pay your current taxes or were not available to you. The statement that the investment funds were no longer available was never substantiated. The information provided to Appeals indicates you had transferred approximately $42,000 last fall from your own Morgan Stanley accounts to the checking account held by your stepson, Jeremy Norris. While there is insufficient information to conclude this was constructively fraudulent, it certainly qualifies as a suspicious transaction that merits further consideration by the collection office. The transfer of liquid funds to a relative was never disclosed in any conversations with Appeals.

On June 23rd, we learned that you told your representative you were able to access your TIAA-CREF accounts. This was never disclosed at the time to Appeals in any of our discussions. In his notes of May 27th, your attorney wrote that he believes you should use the investment accounts to pay NYS Taxation, a junior creditor, and credit cards debts and non-dischargeable taxes in anticipation of a future bankruptcy filing. At no time did your representative make a payment proposal that would include any of your liquid funds on hand. He wrote on June 6th that he would "try to avoid" paying a lump sum payment from the funds you have available.

[*13] A full accounting of the withdrawals and availability of your investment accounts and retirement funds was never provided to Appeals. It was requested more than once during the course of this hearing.

We determine that the collection office may levy as proposed to collect these assessments as you have not offered a payment proposal that is commensurate with your ability to pay from current income. You have not offered to pay anything from the liquid funds you have access to. You have never made a payment since the date of assessment of any of these liabilities. It is our conclusion that it is unlikely that you will pay these liabilities voluntarily to the best of your ability if levy action is not taken. Your intent to delay collection until such time as you could have these liabilities discharged in bankruptcy underscores the need for levy action. You raised no other issues in this due process hearing.

Petitioners are not challenging the existence or the amount of their underlying liability for tax, additions to tax, and interest for 2000, 2001, 2003, 2004, 2005, or 2006. Nor do petitioners challenge that the Office of Appeals properly verified that the requirements of any applicable law or administrative procedure had been met.

The petition in this case was filed September 9, 2008. The case was called for trial on June 15, 2009, and the parties filed a stipulation of facts and exhibits and moved for submission of the case under Rule 122. The motion was granted, and the Court ordered simultaneous briefs, with opening briefs due August 14, 2009. Respondent's brief was timely filed, but on August 14, 2009, petitioners

**[\*14]** filed a petition in bankruptcy; they did not file a brief.  An automatic stay under 11 U.S.C. sec. 362(a) (2006) was in effect until May 25, 2011.  At the request of the parties, a discretionary stay was thereafter entered because of the pendency of an adversary proceeding commenced September 23, 2009, in the bankruptcy court.  Because the bankruptcy case was still pending without discernible activity four years after this case was submitted, the Court ordered petitioners to file an answering brief so that this case could be resolved.  In that brief petitioners argue that the notice of determination was an abuse of discretion because the settlement officer made inappropriate adjustments to their allowed monthly expenses.  Petitioners also contend that the settlement officer misinterpreted the legal bills petitioners provided that showed a discussion of bankruptcy strategy between petitioners and their counsel.

Discussion

Section 6330 provides for notice and opportunity for a hearing, before the IRS may levy upon the property of any person.  Under section 6330(c)(3), the determination to proceed with a collection action "shall take into consideration * * * whether any proposed collection action balances the need for the efficient collection of taxes with the legitimate concern of the person that any collection action be no more intrusive than necessary."

[*15] Petitioners do not challenge their underlying self-reported liabilities or that the settlement officer followed verification procedures required under section 6330(c). They recognize that our review in these circumstances is for abuse of discretion. Abuse of discretion may be found if action is arbitrary, capricious, or without sound basis in fact or law. Giamelli v. Commissioner, 129 T.C. 107, 111 (2007); Woodral v. Commissioner, 112 T.C. 19, 23 (1999).

Section 6159(a) authorizes installment agreements with taxpayers to facilitate collection of the taxpayers' liabilities, and these agreements are within the discretion of the IRS. See sec. 301.6159-1(a), Proced. & Admin. Regs. In reviewing for abuse of discretion, we do not recalculate a taxpayer's ability to pay and substitute our judgment for that of the settlement officer. See Aldridge v. Commissioner, T.C. Memo. 2009-276, slip op. at 16; see also Murphy v. Commissioner, 125 T.C. 301 (2005), aff'd, 469 F.3d 27 (1st Cir. 2006); Speltz v. Commissioner, 124 T.C. 165, 179-180 (2005), aff'd, 454 F.3d 782 (8th Cir. 2006); Hult v. Commissioner, T.C. Memo. 2007-302.

Petitioners in their brief suggest interpretations of the billing records containing discussion of bankruptcy strategy different from those drawn by the settlement officer in his notes. They contend that bankruptcy was intended only as an option, not as something intended to be done after time had passed to make

**[\*16]** more of their liabilities subject to discharge. This argument is apparently intended to counteract a question from the settlement officer concerning their sincerity about paying their Federal tax liabilities. There is no evidence in the record supporting petitioners' explanation, and the settlement officer's interpretations are not unreasonable. (His interpretation was validated by what subsequently occurred in this case.) In any event, the notice of determination does not rely on a subjective reaction to the billing records.

Although petitioners dispute the settlement officer's calculation of their allowable monthly expenses, they acknowledge:

> The settlement officer ultimately based his decision to reject petitioners' proposed installment agreement on his contention that petitioners' present ability to pay "far exceeded what they offered to pay." * * * Whereas the settlement officer calculated that petitioners could afford to pay "at least $9,948" per month towards their outstanding liability, the actual amount that petitioners could afford was at most $6,737.

The amount they offered, however, was only $1,500 to $1,800 per month, increasing to between $3,000 and $4,000 after a year.

Petitioners contend, in effect, that the settlement officer was required to engage in unlimited exchanges to verify the information that petitioners provided, even after alleged errors in that information had been corrected multiple times over months of negotiations. In view of the stipulated

[*17] history of those negotiations, we cannot conclude that the settlement officer acted arbitrarily. Because his determination was reasonably based on the information petitioners provided, we cannot conclude that it was without foundation in fact or law. In reviewing the determination, we do not recalculate petitioners' ability to pay in installments, but the record confirms that their ability significantly exceeded their offer. The settlement officer did not abuse his discretion in sustaining the levy.

We have considered the arguments of petitioners for a contrary result. They are either irrelevant to our conclusion or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.