T.C. Memo. 2018-99

UNITED STATES TAX COURT

MICHAEL ROSENDALE AND TAMARA D. ROSENDALE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 7710-17L.                    Filed July 2, 2018.

<u>Glen E. Frost</u>, <u>Kaitlyn A. Loughner</u>, and <u>Robert B. Hamilton</u>, for petitioners.

<u>Elizabeth C. Mourges</u> and <u>Nancy M. Gilmore</u>, for respondent.

MEMORANDUM OPINION

LAUBER, <u>Judge</u>:  In this collection due process (CDP) case, petitioners

seek review pursuant to section 6330(d)(1)[1] of the determinations by the Internal

_____

[1]All statutory references are to the Internal Revenue Code in effect at all
relevant times, and all Rule references are to the Tax Court Rules of Practice and
Procedure.  We round all monetary amounts to the nearest dollar.

**[*2]** Revenue Service (IRS or respondent) to uphold three notices of intent to levy. The IRS served the levy notices to assist in collecting from petitioners unpaid income tax liabilities for tax years 2008, 2009, and 2012-2015, as well as unpaid trust fund recovery penalties (TFRPs) that it had assessed against petitioner husband for eight calendar quarters during 2008-2010.  Respondent has moved for summary judgment under Rule 121, contending that there are no disputed issues of material fact and that his determination to sustain the proposed collection actions was proper as a matter of law.  We agree and accordingly will grant the motion.

Background

The following facts are based on the parties' pleadings and motion papers, including the attached affidavits and exhibits.  See Rule 121(b).  Petitioners resided in Maryland when they filed their petition.

Petitioners filed delinquent income tax returns for 2008, 2009, and 2012-2014 and a timely income tax return for 2015.  They did not pay the tax shown as due on any of these returns.  On March 17, 2016, in an effort to collect these unpaid liabilities, the IRS sent petitioners a Letter 1058, Final Notice of Intent to Levy and Notice of Your Right to a Hearing, for 2008, 2009, and 2012-2014.  On July 8, 2016, the IRS sent petitioners a separate Letter 1058 for 2015.  Petitioners' aggregate unpaid income tax liabilities for these years exceed $200,000.

**[*3]** Petitioner husband was the sole owner of 2188 Properties LLC, d.b.a. Rosendale Realty (Realty), a Maryland business that encountered financial difficulties. It became delinquent in its employment tax liabilities for the eight calendar quarters in question. The IRS assessed TFRPs against petitioner husband under section 6672, having determined that he was a "responsible person" required to collect, account for, and pay over the withheld employment taxes. On March 17, 2016, the IRS sent petitioner husband a Letter 1058 in an effort to collect these unpaid TFRPs, the aggregate amount of which exceeds $25,000.

Petitioners timely requested CDP hearings. In each request, they checked the boxes "Installment Agreement," "Offer in Compromise," and "I Cannot Pay Balance." In letters attached to two of their hearing requests, they also requested penalty abatement. They did not indicate an intention to challenge their underlying liability for any year or quarter in question.

After receiving petitioners' case a settlement officer (SO) from the IRS Appeals Office confirmed that the tax liabilities and penalties had been properly assessed and that all other requirements of applicable law and administrative procedure had been met. The SO scheduled a telephone CDP hearing and informed petitioners that, in order for her to consider a collection alternative, they needed to supply a completed Form 433-A, Collection Information Statement for Wage

[*4] Earners and Self-Employed Individuals, and proof that they were current on all estimated tax payments.

Before the hearing petitioners submitted a Form 433-A, which showed monthly income of $24,121 and monthly expenses of $24,208. Petitioners also submitted copies of amended returns for 2014 and 2015 and evidence that they had made estimated tax payments of $19,150 for 2016.

The CDP hearing was held on September 27, 2016. Petitioners' counsel requested that their accounts be placed into currently not collectible (CNC) status. The SO asked for additional information about certain expenses petitioners had reported on the Form 433-A, including monthly payments of $1,000 toward an outstanding balance on an American Express credit card and monthly payments on a $127,107 loan encumbering four vacant lots owned by Realty. The SO investigated the status of the 2014 and 2015 amended returns and determined that the IRS had not processed them.

Petitioners subsequently provided some of the requested information, explaining that the American Express balance reflected various Realty-related expenses that petitioners had charged to their credit card. With regard to the loan payments, the SO determined that the outstanding balance on the loan encumbering the vacant lots exceeded the lots' fair market value. She concluded that

**[*5]** neither the American Express payments nor the loan repayments were necessary living expenses for purposes of determining petitioners' entitlement to a collection alternative. She proposed that petitioners sell the vacant lots to free up funds to pay their tax liabilities, but they declined to do this.

Petitioners submitted additional information regarding their housing and vehicle costs. They explained that their current rent was artificially low because they were residing with relatives; they contended that they should instead be allowed the local standard amount for housing, which was higher. They contended that the SO had miscalculated their vehicle expense by not allowing depreciation in addition to vehicle operating costs. The SO rejected both arguments, determining that petitioners should be allowed only their actual housing expenses and that depreciation was not allowable because it was not an out-of-pocket cost.

After reviewing all of this information, the SO determined that petitioners' monthly income would exceed their allowable monthly expenses by $14,591 once certain State tax liabilities were paid off. She accordingly determined that petitioners were not eligible for CNC status. As an alternative, she proposed a partial pay installment agreement (PPIA) under which petitioners would pay $1,929 per month for the first three months of 2017 (enabling them to discharge a portion of

[*6] their Maryland tax liabilities) and $14,591 per month for the ensuing 111 months.[2] On December 14, 2016, the SO mailed this proposal to petitioners and instructed them, if they accepted the proposal, to sign the enclosed Form 433-D, Installment Agreement, and return it to her within 14 days.

On December 28, 2016, petitioners' counsel informed the SO that they would not be accepting the proposed PPIA. Petitioners did not make a counter-offer in that letter or subsequently. After receiving no further communication from petitioners or their counsel during the next nine weeks, the SO closed the case and, on March 6, 2017, issued petitioners notices of determination sustaining the proposed levies. On April 6, 2017, petitioners timely petitioned this Court for review. In August 2017 respondent filed a motion for summary judgment, which petitioners timely opposed.

On April 18, 2018, the Court issued an order directing respondent to file a response addressing the application of section 6751(b)(1) to the TFRPs in question in light of this Court's Opinion in Graev v. Commissioner, 149 T.C. __ (Dec. 20, 2017), supplementing and overruling in part 147 T.C. 460 (2016). Respondent filed a response attaching a declaration from the SO and a Form 4183, Recommen-

---

[2]The SO's PPIA proposal covered the tax liabilities in question here--i.e., petitioners' income tax liabilities for 2008, 2009, and 2012-2015 and petitioner husband's TFRP liabilities--as well as certain liabilities for non-CDP years.

**[\*7]** dation re: Trust Fund Recovery Penalty Assessment. This form shows that the initial determination of the TFRPs by Revenue Officer (RO) Reynolds was approved in writing by Group Manager Doherty, who signed the form before assessment.

## Discussion

I.  Summary Judgment Standard and Standard of Review

The purpose of summary judgment is to expedite litigation and avoid costly, time-consuming, and unnecessary trials. Fla. Peach Corp. v. Commissioner, 90 T.C. 678, 681 (1988). The Court may grant summary judgment when there is no genuine dispute as to any material fact and a decision may be rendered as a matter of law. Rule 121(b); Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), aff'd, 17 F.3d 965 (7th Cir. 1994). In deciding whether to grant summary judgment, we construe factual materials and inferences drawn from them in the light most favorable to the nonmoving party. Sundstrand Corp., 98 T.C. at 520. However, the nonmoving party may not rest upon mere allegations or denials of his pleadings but instead must set forth specific facts showing that there is a genuine dispute for trial. Rule 121(d); see Sundstrand Corp., 98 T.C. at 520. We find that no material facts are in dispute and that this case may appropriately be adjudicated summarily.

**[\*8]** Where a taxpayer's underlying tax liability is properly at issue, we review the IRS' determination de novo. Goza v. Commissioner, 114 T.C. 176, 181-182 (2000). Where (as here) the taxpayers' underlying liabilities are not properly before us,[3] we review the IRS determination for abuse of discretion only. See id. at 181. Abuse of discretion exists when a determination is arbitrary, capricious, or without sound basis in fact or law. See Murphy v. Commissioner, 125 T.C. 301, 320 (2005), aff'd, 469 F.3d 27 (1st Cir. 2006).

II.    Analysis

In deciding whether the SO abused her discretion in sustaining the proposed levies, we review the record to determine whether she:  (1) properly verified that the requirements of applicable law or administrative procedure had been met; (2) considered any relevant issues petitioners raised; and (3) considered "whether any proposed collection action balances the need for the efficient collection of

---

[3]Petitioners have not challenged their underlying income tax liabilities, all of which were self-reported.  In letters attached to their CDP hearing requests they requested abatement of the TFRPs.  But they did not submit to the SO the forms required for abatement consideration.  Nor did they challenge, in their petition to this Court, petitioner husband's liability for the TFRPs.  They are thus precluded from challenging those liabilities here.  See Rule 331(b)(4) ("Any issue not raised in the assignments of error shall be deemed to be conceded."); Thompson v. Commissioner, 140 T.C. 173, 178 (2013) ("A taxpayer is precluded from disputing the underlying liability if it was not properly raised in the CDP hearing."); sec. 301.6330-1(f)(2), Q&A-F3, Proced. & Admin. Regs.

[*9] taxes with the legitimate concern of * * * [petitioners] that any collection action be no more intrusive than necessary." See sec. 6330(c)(3).

A taxpayer may raise at a CDP hearing relevant issues relating to the collection action and is entitled to make offers of collection alternatives. See sec. 6330(c)(2) and (3). In their submissions to the SO petitioners sought two forms of collection alternative: CNC status and an installment agreement (IA).

To be entitled to have his account placed into CNC status, the taxpayer must demonstrate that, on the basis of his assets, equity, income, and expenses, he has no apparent ability to make payments on the outstanding tax liability. See Foley v. Commissioner, T.C. Memo. 2007-242, 94 T.C.M. (CCH) 210, 212; Internal Revenue Manual (IRM) pt. 5.16.1.1 (Aug. 25, 2014). A taxpayer's ability to make payments is determined by calculating the excess of income over necessary living expenses. IRM pt. 5.16.1.2 (Jan. 1, 2016). In reviewing for abuse of discretion, the Court does not substitute its judgment for that of the SO or recalculate a taxpayer's ability to pay. See O'Donnell v. Commissioner, T.C. Memo. 2013-247, 106 T.C.M. (CCH) 477, 481.

The SO denied petitioners' request to have their accounts placed into CNC status, concluding that their monthly income exceeded their allowable monthly expenses by as much as $14,519. Although petitioners challenge the SO's treat-

[*10] ment of various expense items, we find that she did not abuse her discretion in making any of these determinations:

- Petitioners first contend that the SO improperly considered their original 2015 return, rather than their amended 2015 return, in performing her financial analysis. Petitioners filed their amended 2015 return in September 2016; at the time the SO issued the notice of determination, the IRS had not processed the amended return. We find that the SO did not abuse her discretion by considering petitioners' original 2015 return, which was their most recently filed and processed return at that time. See Lloyd v. Commissioner, T.C. Memo. 2017-60, 113 T.C.M. (CCH) 1287, 1289.

- Petitioners contend that the SO should have treated their monthly American Express payments of $1,000 as allowable living expenses. The SO explained to petitioners that if the expenses they were charging to the American Express card were allowable living expenses, those expenses would be allowed separately, and they could not be given credit for the same expenses twice. Petitioners did not submit any documentation to show that they were using the credit card to pay necessary living expenses other than those which the SO had already allowed. By making these payments, petitioners admitted that they had monthly disposable

[*11] income of at least $1,000. This shows, without more, that they were not entitled to CNC status.

• Petitioners contend that the SO should have treated depreciation on their vehicles as allowable living expenses. But SOs are directed to consider only cash expenses in their financial analysis. See IRM pt. 5.15.1.17(2) (Oct. 2, 2012). Depreciation is not a cash expense; the SO therefore did not abuse her discretion by disregarding depreciation. The SO properly allowed vehicle operating expenses of $450 per month, the applicable local standard amount. See id. pt. 5.15.1.9(1)(b).

• Petitioners contend that the SO should have allowed them the standard local housing expense of $2,349 per month, as opposed to the $1,500 per month they were actually paying. The SO did not abuse her discretion in allowing the lesser of petitioners' actual expenses and the standard housing allowance. See id. pt. 5.15.1.9. Petitioners' contention that they might eventually move to new accommodations requiring higher rent is speculation that any taxpayer could advance. The SO did not abuse her discretion by basing her determination on what petitioners' rent actually was, not on what it might be in the future.

• Petitioners contend that the SO erred in not allowing as expenses the full amount of their required estimated tax payments. On their Form 433-A, petitioners reported that their current year tax expense was $7,583. The SO allowed them

**[\*12]** a current year tax expense of $9,465, or $1,882 more than they had requested.

• Petitioners contend that the SO should have treated as allowable living expenses their payments on the $127,107 loan secured by the four vacant lots. In determining a taxpayer's ability to pay, the SO must ascertain whether assets are essential for the production of income. IRM pt. 5.15.1.22 (Oct. 2, 2012). If an asset is necessary for the production of income, an SO may "adjust the income or expense calculation * * * to account for the loss of income stream if the asset were either liquidated or used as collateral to secure a loan." Ibid. When there is no equity in the assets, no adjustment to income or expenses is necessary. Ibid.

Because they were vacant, the four lots secured by the loan were producing no income. Employing the customary "quick sale" methodology, see IRM pt. 5.15.1.20 (Oct. 2, 2012), the SO determined that petitioners had no equity in the vacant lots. For both reasons, the loan payments were not essential for the production of income. The SO therefore did not abuse her discretion in declining to treat these payments as necessary living expenses.[4]

---

[4]Petitioners also contend that the SO did not give them a sufficient allowance for their unpaid State income tax liabilities. For 2013 and prior years, petitioners had an amnesty agreement with the State of Maryland that reduced the aggregate taxes they were required to pay. The SO allowed as expenses the full

(continued...)

[*13] Finally, petitioners contend that the SO erred in handling their request for an IA. After determining that petitioners did not qualify for CNC status, the SO proposed a PPIA under which petitioners would pay $1,929 per month for the first three months of 2017 and $14,591 per month for the balance of the agreement's term. Petitioners rejected this offer. Before closing the case, the SO waited more than two months to see whether petitioners would make a counter proposal, but they never did.

Even if petitioners had made a counter proposal, they were not in full compliance with their ongoing tax obligations for 2016. Although they submitted proof of payment of $19,150 toward their 2016 estimated tax liability, there remained a balance due at the time of the CDP hearing. Petitioners did not make any subsequent payments toward their 2016 tax liability.

Taxpayers must be current on all ongoing tax obligations at the time the proposed IA is to go into effect. See IRM pt. 5.14.1.4.2(18) (Sept. 19, 2014). It is not an abuse of discretion for an Appeals Officer to reject a collection alternative

---

⁴(...continued)
amount of petitioners' Maryland State tax liabilities as thus reduced. See IRM pt. 5.15.1.10(4)(b) (Nov. 17, 2014). Petitioners also had unpaid Maryland State tax liabilities for 2014 and 2015, which the SO did not allow as expenses. But even if she had allowed them, petitioners would still not have qualified for CNC status because their monthly income vastly exceeded their allowable monthly expenses.

**[\*14]** where the taxpayers are not in compliance with their ongoing tax obligations, as petitioners were not for 2016.  See <u>Cox v. Commissioner</u>, 126 T.C. 237, 258 (2006), <u>rev'd on other grounds</u>, 514 F.3d 1119 (10th Cir. 2008); <u>Hull v. Commissioner</u>, T.C. Memo. 2015-86, 109 T.C.M. (CCH) 1438, 1441.

Section 6330(c)(1) and (3)(A) required the SO to verify that all applicable legal and administrative requirements had been met.  One requirement is that imposed by section 6751(b)(1), which provides:  "No penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination or such higher level official as the Secretary may designate."

In <u>Blackburn v. Commissioner</u>, 150 T.C. __ (Apr. 5, 2018), the IRS argued that section 6751(b) does not apply to TFRPs at all.  We found no need to decide that question because the record included a Form 4183 reflecting supervisory approval of the TFRPs in question.  We determined that the Form 4183 was sufficient to enable the SO to verify that the requirements of section 6751(b)(1) had been met with respect to the TFRPs, assuming the IRS had to meet those requirements in the first place.

Here, respondent submitted a declaration that attached a Form 4183 showing that the TFRPs assessed against petitioner husband had been approved in

**[*15]** writing, before assessment, by Group Manager Doherty, the immediate supervisor of RO Reynolds.  In <u>Blackburn</u>, we held that an actual signature is not required; the form need only show that the TFRPs were approved by the RO's supervisor. Accordingly, we find that there is a sufficient record of prior approval of the TFRPs and that the SO properly verified that all other requirements of applicable law and administrative procedure were followed as required by section 6330(c)(1).

Our review of the record establishes that the SO properly discharged all of her responsibilities under section 6330(c)(3).  She correctly determined that petitioners were a very long way from establishing entitlement to CNC status.  They rejected her conditional offer of a PPIA, and they did not propose another collection alternative.  In any event, they failed to establish compliance with their on-going tax obligations.  Finding no abuse of discretion in any respect, we will sustain the proposed collection actions.

To reflect the foregoing,

An appropriate order and decision<br>will be entered.