# United States Tax Court

T.C. Memo. 2023-17

CATTAIL HOLDINGS, LLC, CATTAIL HOLDINGS INVESTMENTS,
LLC, TAX MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————————

Docket No. 27209-21.                    Filed February 14, 2023.

————————

*Ronald A. Levitt*, *Gregory P. Rhodes*, *Michelle A. Levin*, *Sarah E. Green*,
*Sidney W. Jackson IV*, and *Logan C. Abernathy*, for petitioner.

*Annie Lee*, *Matthew A. Cappel*, and *Julie Ann Fields*, for respondent.


## MEMORANDUM OPINION

LAUBER, *Judge*:  This case involves a charitable contribution de-
duction claimed by Cattail Holdings, LLC (Cattail), for the donation of
a conservation easement.  The Internal Revenue Service (IRS or re-
spondent) issued Cattail a notice of final partnership administrative ad-
justment (FPAA) for 2017 disallowing this deduction and determining
penalties.  Petitioner timely petitioned this Court for readjustment of
partnership items.

Currently before the Court is respondent's Motion for Partial
Summary Judgment.  Respondent contends that the IRS properly disal-
lowed the deduction because the deed of easement permits surface min-
ing, which would have as its corollary that the conservation purpose is

[*2] not "protected in perpetuity." *See* § 170(h)(5)(A).[1] Separately, respondent contends that the IRS complied with the requirements of section 6751(b)(1) by securing timely supervisory approval of all penalties at issue. We will deny the Motion on the section 170(h)(5)(A) question but grant it with respect to section 6751(b)(1).[2]

*Background*

The following facts are derived from the pleadings, the parties' Motion papers, and the Exhibits and Declarations attached thereto. They are stated solely for purposes of deciding respondent's Motion and not as findings of fact in this case. *See Sundstrand Corp. v. Commissioner*, 98 T.C. 518, 520 (1992), *aff'd*, 17 F.3d 965 (7th Cir. 1994).

Cattail is a Delaware limited liability company (LLC) organized in August 2017. It is treated as a TEFRA partnership for Federal income tax purposes, and petitioner Cattail Holdings Investments, LLC, is its tax matters partner.[3] Cattail had its principal place of business in Georgia when the Petition was timely filed. Absent stipulation to the contrary, appeal of this case would lie to the U.S. Court of Appeals for the Eleventh Circuit. *See* § 7482(b)(1)(E).

In September 2016 Dolomite Holdings 251, LLC (Dolomite), acquired a 723-acre tract of land in Chesterfield, Virginia. On November 28, 2017, Dolomite contributed roughly 207 acres of this tract (Property) to Cattail in exchange for a 100% interest in Cattail. Dolomite subsequently sold interests in Cattail to investors.

In December 2017 Cattail granted an open-space conservation easement over the Property to the Foothills Land Conservancy

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, all regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] The FPAA also disallowed a $1,087,819 business expense deduction on the ground that it was a "nondeductible syndication expense," *see* § 709, and lacked substantiation, *see* § 162. That adjustment remains at issue. Respondent has also reserved the right to advance additional theories to support disallowance of the charitable contribution deduction.

[3] Before its repeal, TEFRA (the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, §§ 401–407, 96 Stat. 324, 648–71) governed the tax treatment and audit procedures for many partnerships, including Cattail.

**[\*3]** (Foothills or grantee), a "qualified organization" for purposes of section 170(h)(3). The deed of easement was recorded on December 21, 2017.

The easement deed states that its interpretation is governed by Virginia law and recites the parties' intent that the land "be retained forever in its undeveloped, natural, scenic, farm land, forested and/or open land condition." The deed generally prohibits commercial, industrial, or residential development. But it reserves certain rights to Cattail as grantor, including the rights to engage in forestry and recreational activities such as hiking, camping, hunting, fishing, and horseback riding. In connection with these recreational activities Cattail reserved the right to build fences, bridges, and trails. Cattail also reserved the right to construct barns, sheds, and facilities "for the generation of renewable electrical power."

Paragraph 3 of the deed prohibits any activity on the Property that would be "inconsistent with the Purpose of th[e] Easement, the Conservation Purposes or the Conservation Values herein protected." Paragraph 4(s) similarly provides that Cattail "may not exercise any of its rights reserved under this Easement in such a manner to adversely impact the Conservation Purposes or Conversation Values of the Property." To ensure that Cattail's exercise of a reserved right would not impair any conservation purpose, paragraph 5 requires Cattail to seek Foothills' prior consent "[w]henever notice is required pursuant to Paragraph 3(d) or Paragraph 4" of the deed. If Foothills did not respond to such a request within 30 days, Foothills would be deemed to have withheld its consent and "such withholding shall be deemed to be reasonable."

In addition to the deed's general prohibition against any activity "inconsistent with the Purpose of th[e] Easement," paragraph 3 lists numerous specific prohibitions. Of relevance here is paragraph 3(h), which bars mining activities. It expressly prohibits:

> The exploration for, or development and extraction of, minerals and hydrocarbons by any surface or subsurface mining method, by drilling, or by any other method, or transportation of the same via new pipelines or similar facilities, that would impair or interfere with the Conservation Purposes and Conservation Values of the Property in any material respect in the discretion of the Grantee.

[*4]  Paragraph 3 states that the prohibited uses are "subject to those reserved rights set forth [in] Paragraph 4." But paragraph 4 reserves to Cattail no mining rights of any kind. Apart from paragraph 3(h), which bars surface and subsurface mining, the deed contains no reference to mineral exploration, development, or extraction.

Cattail timely filed Form 1065, U.S. Return of Partnership Income, for its 2017 tax year. On that return it claimed a charitable contribution deduction of $40,675,000 for its donation of the easement. In support of this supposed value Cattail relied on an appraisal prepared by Dale W. Hayter, Jr.

The IRS selected Cattail's 2017 return for examination and assigned the case to Revenue Agent (RA) Kendrick Veney. In connection with the examination Kenneth Baker, an IRS senior appraiser, prepared an "appraisal review report" that evaluated Mr. Hayter's appraisal. Mr. Baker's report, which RA Veney received in October 2020, concluded that the fair market value (FMV) of the donated easement was $3,563,000. Mr. Baker indicated that the "[i]ntended use [of his report] is for examination of a non-cash charitable contribution." Nowhere in his report does Mr. Baker recommend the assertion of any penalty against Cattail, for valuation misstatement or otherwise.

In April 2021, as the examination neared completion, RA Veney recommended assertion against Cattail of the 40% penalty for gross valuation misstatement. *See* § 6662(h). In the alternative, he recommended assertion of a 20% penalty for substantial valuation misstatement, reportable transactions understatement, negligence, and/or substantial understatement of income tax. *See* §§ 6662(b)(1)–(3), (c)–(e), 6662A(b).

RA Veney's recommendations to this effect were set forth in a penalty consideration lead sheet, a copy of which is attached to respondent's Motion. RA Veney's team manager, Lee Volkmann, digitally signed the penalty lead sheet on April 26, 2021. Mr. Volkmann verified that he was the "immediate supervisor . . . of Kendrick Veney, who made the initial determination to assert the penalties indicated on this form," and that Mr. Volkmann "approve[d] that initial determination." RA Veney has submitted a declaration under penalty of perjury averring that these facts are true and accurate.

On May 21, 2021, RA Veney mailed petitioner a packet of documents, including Form 5701, Notice of Proposed Adjustment, and Form

[*5] 886–A, Explanation of Items, which set forth the proposed adjustments and penalty determinations. Two months later, on July 23, 2021, the IRS issued petitioner an FPAA, including a Form 886–A, disallowing the charitable contribution deduction in full and determining penalties. The FPAA alternatively determined that, if any deduction were allowable, Cattail had not established the value of the easement. Petitioner timely petitioned this Court for readjustment of the partnership items.

*Discussion*

I. *Summary Judgment Standard*

The purpose of summary judgment is to expedite litigation and avoid costly, unnecessary, and time-consuming trials. *See FPL Grp., Inc. & Subs. v. Commissioner*, 116 T.C. 73, 74 (2001). We may grant partial summary judgment regarding an issue as to which there is no genuine dispute of material fact and a decision may be rendered as a matter of law. *See* Rule 121(b); *Sundstrand Corp.*, 98 T.C. at 520. In deciding whether to grant partial summary judgment, we construe factual materials and inferences drawn from them in the light most favorable to the nonmoving party. *Sundstrand Corp.*, 98 T.C. at 520. Where the moving party properly makes and supports a motion for summary judgment, "an adverse party may not rest upon the mere allegations or denials of such party's pleading" but must set forth specific facts, by affidavit or otherwise, showing that there is a genuine dispute for trial. Rule 121(d).

II. *Analysis*

A. *"Protected in Perpetuity"*

The Code generally restricts a taxpayer's charitable contribution deduction for the donation of "an interest in property which consists of less than the taxpayer's entire interest in such property." § 170(f)(3)(A). But there is an exception for a "qualified conservation contribution." § 170(f)(3)(B)(iii), (h)(1). For the donation of an easement to be a "qualified conservation contribution," the conservation purpose must be "protected in perpetuity." § 170(h)(1)(C), (5)(A); *see TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th 1354, 1362 (11th Cir. 2021); *PBBM-Rose Hill, Ltd. v. Commissioner*, 900 F.3d 193, 201 (5th Cir. 2018).

Section 170(h)(5)(B)(i) provides that the conservation purpose will not be treated as protected in perpetuity if "there is a retention of a qualified mineral interest [and] if at any time there may be extraction or

**[\*6]** removal of minerals by any surface mining method."  Respondent contends that the easement deed "permits surface mining" in violation of this provision.  According to respondent, paragraph 3(h) of the deed endows Cattail with a "contingent right to engage in surface mining," subject to Foothills' approval.  Paragraph 3(h) assertedly allows surface mining unless, "in the discretion of the Grantee," such activity "would impair or interfere with the Conservation Purposes and Conservation values of the Property in any material respect."

Respondent's argument is unconvincing for at least three reasons.  First, section 170(h)(5)(B)(i) applies only "where there is a retention of a qualified mineral interest."  Respondent can point to no provision of the easement deed in which Cattail retains the right to exploit any "qualified mineral interest."  *See* § 170(h)(6)(A).  Paragraph 4 of the deed enumerates 18 "Reserved Rights" retained by Cattail.  These include the rights (among other things) to engage in the grazing of livestock, conduct farming operations, cultivate fruit trees, engage in silviculture, construct agricultural outbuildings and utilities, and create facilities for generation of alternative energy.

Paragraph 4 reserves to Cattail no right to engage in any mining-related activity.  Mining rights are mentioned in only one paragraph of the deed, paragraph 3(h).  That paragraph expressly prohibits "[t]he exploration for, or development and extraction of, minerals and hydrocarbons by any surface or subsurface mining method, by drilling, or by any other method."  We do not see how a prohibition against mining can be interpreted to endow Cattail, sub silentio, with a reserved right to engage in mining.[4]

Second, respondent errs in interpreting paragraph 3(h) to allow mining "in the discretion of [the] Grantee."  That phrase appears in the second half of the paragraph, which is addressed, not to the development or extraction of minerals, but to possible future "transportation of the same via new pipelines or similar facilities."  Paragraph 3(h) says that transportation of minerals is likewise prohibited if it would impair

---

[4] Nor does respondent allege that a party *other than* Cattail has retained a qualified mineral interest, i.e., that "ownership of the surface estate and mineral interests has been and remains separated."  § 170(h)(5)(B)(ii).  Even if respondent made that showing, the charitable contribution deduction would not be disallowed if "[t]he probability of surface mining occurring on such property is so remote as to be negligible."  *Id.*  That would present a question of fact to be decided "on a case by case basis," Treas. Reg. § 1.170A-14(g)(4)(ii)(A) (flush text), and thus be inappropriate for summary adjudication.

**[*7]** conservation values "in any material respect in the discretion of Grantee."

The final phrase, "in the discretion of Grantee," modifies the immediately preceding phrase, "in any material respect." *See Am. Gen. Fin., Inc. v. Paschen (In re Paschen)*, 296 F.3d 1203, 1209 (11th Cir. 2002) (applying the rule of last antecedent in statutory construction). The second half of paragraph 3(h) thus gives Foothills the discretion to determine whether any impairment of conservation values caused by transportation of minerals would be "material." Far from permitting development or extraction of minerals, this grant of discretionary authority gives Foothills maximum power to prevent any transportation of existing minerals that it views as problematic.

Third, respondent's notion that the deed permits surface mining with Foothills' approval strikes us as fanciful. Section 170(h)(5)(B) is captioned, "No surface mining permitted." It makes clear that allowing surface mining would be wholly inconsistent with the easement's conservation purpose. Paragraph 3 of the deed explicitly prohibits "[a]ny activity or use of the Property inconsistent with the purpose of this Easement." In assuming "a contingent right to engage in surface mining," respondent thus posits that Foothills might be faithless to its charitable mission by permitting Cattail to engage in activity explicitly barred by the statute. That is not a proposition that can plausibly be advanced in a motion for summary judgment.[5]

B.  *Penalty Approval*

Section 6751(b)(1) provides that "[n]o penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination." In *Kroner v. Commissioner*, 48 F.4th 1272, 1276 (11th Cir. 2022), *rev'g in part* T.C. Memo. 2020-73, the U.S. Court of Appeals for the Eleventh Circuit held that "the IRS satisfies [s]ection 6751(b) so long as a supervisor approves an initial

---

[5] In any event, if the deed were thought ambiguous as to whether Cattail retained a contingent right to engage in surface mining, this ambiguity would need to be resolved under principles of Virginia law, which might include parol evidence. *See Morgan Run Partners, LLC v. Commissioner*, T.C. Memo. 2022-61, 123 T.C.M. (CCH) 1324, 1326; *Tuomala v. Regent Univ.*, 477 S.E.2d 501, 505 (Va. 1996) ("When the language of a contract is ambiguous, parol evidence is admissible, not to contradict or vary contract terms, but to establish the real contract between the parties . . . [and] to determine the intention of the parties.").

[*8] determination of a penalty assessment before [the IRS] assesses those penalties." The court interpreted the phrase "initial determination of [the] assessment" to refer to the "ministerial" process by which the IRS formally records the tax debt. *See id.* at 1278. Absent stipulation to the contrary this case is appealable to the Eleventh Circuit, and we thus follow its precedent. *See Golsen v. Commissioner*, 54 T.C. 742, 756–57 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971).

Under a literal application of the standard enunciated in *Kroner*, supervisory approval could seemingly be secured at any moment before actual assessment of the tax. But the Eleventh Circuit left open the possibility that supervisory approval in some cases might need to be secured sooner, i.e., before the supervisor "has lost the discretion to disapprove" the penalty determination. *See Kroner v. Commissioner*, 48 F.4th at 1279 n.1; *cf. Laidlaw's Harley Davidson Sales, Inc. v. Commissioner*, 29 F.4th 1066, 1074 (9th Cir. 2022) (treating supervisory approval as timely if secured before the penalty is assessed or "before the relevant supervisor loses discretion whether to approve the penalty assessment"), *rev'g and remanding* 154 T.C. 68 (2020); *Chai v. Commissioner*, 851 F.3d 190, 220 (2d Cir. 2017) (concluding that supervisory approval must be obtained at a time when "the supervisor has the discretion to give or withhold it"), *aff'g in part, rev'g in part* T.C. Memo. 2015-42.

All of the penalties at issue in this case were approved by Mr. Volkmann on April 26, 2021. Respondent has supplied a copy of the penalty consideration lead sheet, which Mr. Volkmann digitally signed as RA Veney's "immediate supervisor." RA Veney has supplied a declaration confirming that Mr. Volkmann supervised him during the Cattail examination. We accordingly conclude that Mr. Volkmann was RA Veney's "immediate supervisor" within the meaning of section 6751(b)(1). *See Sand Inv. Co. v. Commissioner*, 157 T.C. 136, 142 (2021) (holding that the "immediate supervisor" is the person who supervises the agent's substantive work on an examination).

The Notice of Proposed Adjustment was mailed to petitioner on May 21, 2021, and the FPAA was issued on July 23, 2021. As of April 26, 2021, therefore, the IRS examination remained at a stage where Mr. Volkmann had discretion to approve or disapprove the penalty determinations. *See Kroner v. Commissioner*, 48 F.4th at 1279 n.1. Therefore, under a reading of *Kroner* most favorable to petitioner, the IRS complied with section 6751(b)(1) so long as Mr. Volkmann was the appropriate person to supply such approval.

**[\*9]**　Petitioner advances two arguments, the gist of which is that Mr. Volkmann was not the right person to approve the penalties. First, with respect to the reportable transaction understatement penalty imposed by section 6662A(a) and (b), petitioner asserts that it was not RA Veney but "higher-level officials within the IRS" who made the "initial determination of [the penalty] assessment." *See* § 6751(b)(1). That is supposedly so because, in 2017, the IRS issued a public notice advising that participants in syndicated easement transactions risked certain penalties. *See* I.R.S. Notice 2017-10, 2017-4 I.R.B. 544, 546. And the IRS subsequently advised that, in examining easement transactions based on inflated valuations, "[e]very available enforcement option will be considered, including civil penalties." I.R.S. News Release IR-2019-182 (Nov. 12, 2019).

On the basis of these public announcements, petitioner hypothesizes that "[t]he decision to assert penalties in all transactions falling under Notice 2017-10 was made by higher-level officials within the IRS sometime in 2019." From that premise petitioner concludes that, as of April 26, 2021, RA Veney had no discretion whether to recommend assertion of the section 6662A(a) penalty against Cattail and that Mr. Volkmann had no discretion whether to approve it. Rather, in petitioner's view, approval needed to have been secured back in 2019 from the "immediate supervisor" of the "higher-level IRS officials," whoever that person might be thought to have been.

We are not persuaded. Notice 2017-10 informed the public that taxpayers participating in certain transactions risked certain penalties. And the 2019 news release informed the public that all available enforcement options, including civil penalties, "will be considered." Neither pronouncement determined any penalties against any taxpayer within the meaning of section 6751(b)(1).

As we have held, the "initial determination of [a penalty] assessment" is a formal action by the Examination Division directed to a particular taxpayer. *See Belair Woods, LLC v. Commissioner*, 154 T.C. 1, 15 (2020) (holding that an "initial determination" is embodied in the document by which the IRS "formally notifies the taxpayer . . . [of its] unequivocal decision to assert penalties"); *Frost v. Commissioner*, 154 T.C. 23, 32 (2020) (ruling that supervisory approval must be secured "before the first formal communication to the taxpayer of penalties"). Our inquiry thus turns on the timeliness of penalty approval vis-a-vis "the taxpayer against whom the penalties are being asserted." *Excelsior Aggregates, LLC v. Commissioner*, T.C. Memo. 2021-125, at *16.

**[\*10]** We have previously ruled that IRS announcements to the public at large, including Notice 2017-10 and related news releases, cannot constitute "the initial determination of [a penalty] assessment" because such announcements are not directed to a specific taxpayer whose return is under IRS examination. *See Pickens Decorative Stone, LLC v. Commissioner*, T.C. Memo. 2022-22, 123 T.C.M. (CCH) 1127, 1129–30 (citing *Frost*, 154 T.C. at 32). The "initial determination of [a penalty] assessment" occurs when the IRS makes "an unequivocal decision to assert penalties." *See Belair Woods*, 154 T.C. at 15. The IRS could not have made an unequivocal decision to assert penalties against Cattail before reviewing its return to determine whether an "understatement" existed. *See Thompson v. Commissioner*, 155 T.C. 87, 92 (2020). That determination could not have been made "sometime in 2019" because the IRS examination of Cattail's return did not conclude until mid-2021.

In the alternative petitioner suggests that, at least with respect to the valuation misstatement penalties, it was Mr. Baker, not RA Veney, who made the "initial determination of [the penalty] assessment." *See* § 6751(b)(1). Mr. Baker, an IRS senior appraiser, prepared an "appraisal review report" that evaluated the appraisal submitted with Cattail's return. Mr. Baker's report, which RA Veney received in October 2020, concluded that the FMV of the donated easement was $3,563,000.

Petitioner asserts that respondent has produced "no evidence to show that Agent Veney made an independent determination or was permitted not to assert valuation penalties" following receipt of Mr. Baker's report. If Mr. Baker in fact made the "initial determination of [the penalty] assessment," *see* § 6751(b)(1), his supervisor, not RA Veney's supervisor, would supposedly have been the proper person to consider penalty approval. Petitioner contends that uncertainty on this point creates a genuine dispute of material fact, thus precluding summary judgment.

Again we disagree. Nowhere in his report does Mr. Baker recommend the assertion of any penalty against Cattail, for valuation misstatement or otherwise. His limited role was to review Cattail's appraisal and provide his evaluation of it to RA Veney for the latter's use in the "examination of a non-cash charitable contribution." RA Veney was free to disagree with any aspect of Mr. Baker's report, including his methodology, his comparable transactions, and his bottomline conclusion.

**[\*11]**  In-house IRS appraisers do not have the authority to "determine" penalties; they simply offer an opinion as to value.  During an IRS examination it is the duty of a revenue agent to determine penalties, taking into account (among other things) the value of the property contributed and possible defenses the taxpayer may have.  The word "determination" has "an established meaning in the tax context and denotes a communication with a high degree of concreteness and formality." *Belair Woods*, 154 T.C. at 15.  An "initial determination" thus signifies a "consequential moment" of IRS action.  *Ibid.* (quoting *Chai v. Commissioner*, 851 F.3d at 221).  A preliminary recommendation offered by an appraiser to a revenue agent is simply not a "determination" within the meaning of section 6751(b)(1).

Even if Mr. Volkmann is "the immediate supervisor" for section 6751(b)(1) purposes, petitioner urges that Mr. Volkmann in effect was bound by Mr. Baker's report and did not make an independent assessment as to whether penalties should apply.  But here petitioner misapprehends the statutory requirements: Section 6751(b) is captioned "Approval of Assessment," not "Explanation of Assessment."  *See Pickens Decorative Stone*, 123 T.C.M. (CCH) at 1130.  As we have said before: "The written supervisory approval requirement . . . requires just that: written supervisory approval."  *Ibid.* (quoting *Raifman v. Commissioner*, T.C. Memo. 2018-101, 116 T.C.M. (CCH) 13, 28).  We have repeatedly rejected any suggestion that a penalty approval form or other document must "demonstrate the depth or comprehensiveness of the supervisor's review."  *Belair Woods*, 154 T.C. at 17.  We do not second-guess the extent of the RA's or the supervisor's deliberations about whether penalties should be imposed.  We confine our search to seeking evidence of written supervisory approval.  *See Raifman*, 116 T.C.M. (CCH) at 27–28.

In this case it is undisputed that RA Veney prepared the penalty consideration lead sheet, recommending assertion of all the penalties at issue, and that Mr. Volkmann, his immediate supervisor, timely signed this form on April 26, 2021.  Petitioner has offered no evidence to controvert these facts.  *See* Rule 121(d) (providing that a party opposing summary judgment may not rely on "mere allegations or denials" but "must set forth specific facts," including facts established "by affidavits or declarations"); *Frost*, 154 T.C. at 35.  There being no genuine dispute of material fact on these points, we will grant respondent's Motion with respect to penalty approval.

**[\*12]**  To reflect the foregoing,

*An order will be issued granting in part and denying in part respondent's Motion for Partial Summary Judgment.*